# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

KC **FILED**

JUL 1 3 2005

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

DAN DURAN, et al.,
    Plaintiffs,

v.

MICHAEL F. SHEAHAN, Sheriff of
Cook County, et al.,
    Defendants.

74 C 2949

THE HONORABLE JUDGE
GEORGE M. MAROVICH

## NOTICE OF FILING

TO:   See Attached Service List

    **PLEASE TAKE NOTICE** that on July 13, 2005, we caused to be filed with the Clerk of the United States District Court for the Northern District of Illinois, Eastern Division, the attached PRESIDENT STROGER AND THE COOK COUNTY BOARD OF COMMISSIONERS' JULY 13, 2005 STATUS REPORT.

    Respectfully submitted,

    RICHARD A. DEVINE
    State's Attorney of Cook County

By:    _____

    Donald J. Pechous
    Assistant State's Attorney
    500 Richard J. Daley Center
    Chicago, IL 60602
    (312) 603-3378

## CERTIFICATE OF SERVICE

    I, Donald J. Pechous, Assistant State's Attorney, hereby certify that the attached President Stroger And The Cook County Board Of Commissioners' July 13, 2005 Status Report was served upon the above-named parties on July 13, 2005, by hand delivery before 5:00 p.m.

    _____
    Donald J. Pechous

## SERVICE LIST

James R. Coldren, Jr.
Charles A. Fasano
John Howard Association/For Prison Reform
300 West Adams Street
Chicago, IL 60606

Robert Lehrer, Esq.
Diane Redleaf, Esq.
Lehrer & Redleaf
36 S. Wabash, Suite 600
Chicago, IL 60603

Daniel F. Gallagher, Esq.
Query and Harrow, Ltd.
175 W. Jackson Blvd., Suite 1600
Chicago, IL 60604

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

FILED

JUL 13 2005

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

DAN DURAN, et al.,
    Plaintiffs,

    v.

MICHAEL F. SHEAHAN, Sheriff
of Cook County, et al.,
    Defendants.

74 C 2949

THE HONORABLE JUDGE
GEORGE M. MAROVICH

## PRESIDENT STROGER AND THE COOK COUNTY BOARD OF COMMISSIONERS' JULY 13, 2005 STATUS REPORT

RICHARD A. DEVINE
State's Attorney of Cook County

PATRICK T. DRISCOLL, Jr.
Deputy State's Attorney
Chief, Civil Actions Bureau

THOMAS V. LYONS
Assistant State's Attorney
Deputy Chief, Civil Actions Bureau

DONALD J. PECHOUS
JAMIE M. SHEEHAN
Assistant State's Attorneys
Torts/Civil Rights Division
500 Richard J. Daley Center
Chicago, Illinois 60602

July 13, 2005

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| DAN DURAN, <u>et al.</u>,<br>    Plaintiffs, | 74 C 2949 |
| v. | THE HONORABLE JUDGE<br>GEORGE M. MAROVICH |
| MICHAEL F. SHEAHAN, Sheriff<br>of Cook County, <u>et al.</u>,<br>    Defendants. | |

**PRESIDENT STROGER AND THE COOK COUNTY BOARD OF
COMMISSIONERS' STATUS REPORT**

**INTRODUCTION**

President John H. Stroger, Jr. and the Cook County Board of Commissioners ("County Defendants"), present this Status Report to illustrate their continued efforts toward maintaining full compliance with each of the terms of the <u>Duran</u> Consent Decree, and, respond to the John Howard Association (JHA) Status Report of May 13, 2005.

Since 1982, when the Consent Decree was entered, the County Defendants have continuously recorded a positive trend of significant improvements at the Cook County Department of Corrections complex. The County Defendants, through their affiliated departments and agencies, and in collaboration with Sheriff Michael Sheahan, have continued to demonstrate their dedication to furnishing constitutionally sound conditions of pre-trial confinement.

## POPULATION MANAGEMENT AND CONTROL

## POPULATION AND CAPACITY

A significant reduction in the overflow population at the CCDOC is imminent. The County Defendants are pleased to report that the renovation and expansion of the Pre-Release Center ("PRC"), by an additional 150 beds, is largely complete. A certificate of occupancy has been obtained from the City of Chicago. Funding for 66 correctional officers to staff the expansion has been approved. The last hurdle to completing the expansion is the delivery of the actual beds. DFM administrators have been informed that Cook County Department of Community Supervision and Intervention (DCSI) officials ordered the beds and anticipate the arrival of the beds shortly. DFM stands ready to install the beds within a few days after their arrival.

In addition to the 150-bed expansion of the PRC, the impending completion of a major renovation project in Division II will have a substantial positive impact on the overcrowding problems at the CCDOC. The scope of the renovations mandated that one-half of each dorm had to be closed down during the work. The result of these closures meant a reduction in jail capacity of 400 to 470 beds at any given time. As noted by JHA, the completion of renovations will not only allow Division II to return to full capacity, that capacity will be increased by 48 beds for a total capacity of 1,898. See JHA May 13, 2005 Status Report, pg. 12. Accordingly, the result of the additional PRC beds, coupled with placing all beds in Division II on-

2

line, means that nearly 600 additional beds will be available in the coming months. Considering that the average daily overflow population of the CCDOC during April of 2005 was 648, there are substantial grounds for optimism regarding a significant reduction, if not the elimination, of the overcrowding problem in the near future.

With an eye towards reducing detainees' average length of stay (LOS) and improving the efficiency of the Cook County criminal justice system, a study has been commissioned and is being conducted by a team led by Professor Joseph Trotter of American University. The Trotter team is expected to analyze multiple aspects of the Cook County criminal justice system and make recommendations including proposals for the more efficient disposition of criminal cases. The Trotter team's conclusions regarding LOS statistics are keenly anticipated by the County Defendants not only in regard to overcrowding, but also as they relate to the correctional officer staffing issue. The significance of the Trotter team's conclusions regarding LOS data and staffing is discussed in more detail below.

## CONDITIONS & COMPLIANCE WITH THE CONSENT DECREE
### ENVIRONMENTAL HEALTH

Over the past reporting year, the Office of Capital Planning and Policy (CPP), and Department of Facilities Management (DFM) have maintained substantial compliance with the Consent Decree in each area of the CCDOC. The JHA has acknowledged that during the period of time covered in its May 13, 2005 Status Report, sustained progress has occurred in dealing with issues relating to

3

mechanical maintenance of CCDOC facilities. See JHA May 13, 2005 Status Report, pg. 59. The County Defendants continue to devote considerable resources to control the complex range of maintenance-related issues, which are presented by an institution the size of the CCDOC.

Ironically, the class members themselves continue to cause constant and significant damage to CCDOC facilities. Detainee vandalism results not only in the direct damage to the CCDOC infrastructure, but also has a ripple-effect by causing valuable resources to be diverted from maintenance needs that are the result of normal wear and tear.

The County Defendants continue their bi-annual efforts to conduct facility assessments of all relevant facilities. These assessments are then integrated into five-year plans that include provisions for maintenance and capital improvements. Where necessary, five-year plans are appropriately revised.

JHA has remarked that CCDOC administrators have begun to compile accurate counts of cells, throughout the complex, that are closed due to maintenance issues. See JHA May 13, 2005 Status Report, pg. 56. DFM administrators recognize the importance of ensuring that every bed in the CCDOC complex is available for detainee use. Accordingly, CCDOC officials are encouraged to provide DFM, on a weekly basis, with information regarding cells that are out of commission.

The following information addresses activity by DFM in each division and

4

other jail facilities as addressed by the JHA.

### DIVISION I

The JHA has acknowledged that most portions of the living units and other areas, including recreation rooms and law libraries, have been well maintained. See JHA May 13, 2005 Status Report, pg. 59. DFM continues to prioritize and address maintenance of shower areas in an ongoing fashion.

### DIVISION II

As discussed above, the County Defendants are pleased to report that they are in the final phase of major renovations to Division II and anticipate completion in December of 2005. JHA details in its report, the renovations that included new windows, a new HVAC system, new lighting, plumbing and paint. See JHA May 13, 2005 Status Report, pg. 60. The completion of this project will dramatically improve the living conditions in this Division, solve all mechanical maintenance issues, and ameliorate detainee overcrowding in the CCDOC.

### DIVISION III

DFM performs maintenance, including floor tile replacement, in an ongoing manner, based upon work orders submitted. As noted by JHA, most maintenance needs have been handled in a timely and appropriate fashion. See JHA May 4, 2004 Status Report, pg. 61.

### DIVISION IV

JHA notes that temperature control problems continue in Division IV. See

JHA May 13, 2005 Status Report, pg. 61. In April of 2004, DFM completed a major project designed to improve temperature control by installing 20 new steam/chill water coils in this Division. DFM will monitor this situation and take corrective action, if necessary. DFM continues to address additional maintenance concerns, such as damaged floor tiles, electrical work and damaged partitions around the toilets, in an ongoing manner.

### DIVISION V

To date, shower area renovations are complete in 22 of 24 living units. This renovation has involved removal of the interior dividers that created individual shower stalls in the shower area, installation of new epoxy-based wall and floor coverings, new showerheads and floor drains, and improved ventilation. Renovations to the two remaining shower areas will restart soon after the Division II renovations are finished at the end of this year. Similar to the Division II renovations, the shower area renovations require that living units be shut down during the project. In an effort to mitigate the impact on the overflow population of losing 400-470 beds at any one time during the Division II project, a decision was made to halt the shower renovations until Division II was back at full capacity. DFM expects to complete the shower renovations to the last two living units during 2006.

### DIVISION VI

JHA acknowledges relatively few major maintenance problems in this

6

Division. See JHA May 13, 2005 Status Report, pg. 62. Sanitation improvement within Division VI receives positive acknowledgement from JHA. DFM tradesmen will continue to address maintenance problems in a timely fashion.

### DIVISION VIII

Funds have been allocated for RU building renovations. Currently, a major project to replace the HVAC system and the hot water supply has been approved and is in the bidding process. As JHA noted in its 2004 report, significant improvements have been made to the RU building and additional improvements are planned in the near future. See JHA May 4, 2004 Status Report, pg. 56. DFM continues to maintain the RU building based on work order requests.

### DIVISION IX

As noted by JHA, problems with "scores" of locks throughout the Division have been addressed and solved. See JHA May 13, 2005 Status Report, pg. 63. Contrary however to the JHA report, issues regarding light fixtures have not been ignored and light fixture replacement has not been cancelled. (Id.) In recent weeks, two living units in Division IX have been relamped. Hopefully, the new light fixtures will prove to be resistant to the unrelenting detainee vandalism. DFM administrators have planned a three-month test period for these new fixtures. If the test of the new fixtures is successful, the entire Division will be supplied with the new fixtures. As JHA noted in its 2004 report, the improvements made to Division IX have been significant. See JHA May 4, 2004 Status Report, pg. 57.

7

## DIVISION X

As reported by JHA, most routine maintenance needs have been handled promptly and effectively. See JHA May 13, 2005 Status Report, pg. 63. JHA is critical of floors in the Division that suffer from chipped and peeling paint. Id. at 63-64. DFM administrators believe that many of the problems related to chipped and peeling paint are caused by power washing that is improperly performed by detainee workers. DFM officials will confer with CCDOC officials and propose a power washing procedure that will not result in such damage.

## DIVISION XI

JHA remarks that living conditions in Division XI are generally satisfactory and that window and door damage has been repaired. See JHA May 13, 2005 Status Report, pg. 64. All cell doors and locks in Division XI were repaired, and security features were added in 2003.

## CENTRAL KITCHEN

JHA cites problems with an expansion joint in the Central Kitchen. See JHA May 13, 2005 Status Report, pg. 64. DFM administrators note that this expansion joint was replaced on May 21, 2005. Additional recent improvements to the Central Kitchen include the installation of a new ceiling and new lighting throughout.

## PRE-RELEASE CENTER (CCDSCI)

No significant maintenance problems in living areas and other areas used by detainees currently exist as acknowledged by JHA. See JHA May 13, 2005 Status

Report, pg. 65.

### GENERAL MAINTENANCE ISSUES

Significant repairs and improvements to the CCDOC infrastructure continue to be made. DFM notes that over 23,000 work orders were addressed and completed during 2004.

Some projects not already discussed above are as follows:

- A major project to completely redesign and rework every lock in Divisions IX, X, and XI has been successfully completed.

- Drug-sensing machines at the entrances to the CCDOC complex have been wired.

- Although completed in 2002, a major elevator renovation project continues to be cited as a critical success by DFM administrators. Prior to renovations, repairs to the elevators exceeded one-half million dollars per year and consumed valuable resources better spent elsewhere.

DFM will investigate and readdress the issue regarding worn stair treads in Divisions IV, V and VI.

While DFM understands the concerns of JHA regarding burned-out light bulbs, DFM notes that the cause of most bulbs not working is the result of detainee vandalism. Consequently, even if DFM was not bound by a collective bargaining agreement that requires electricians to change the bulbs, experience shows that delegating the task to correctional officers would not solve the problem. DFM

9

remains confident in its staff's ability to handle all work requests, including light bulb replacement, in a timely fashion.

### RECEIVING ROOM and RU BUILDING

JHA continues to be highly critical of the Receiving Room in Division V and has recently become highly critical of the RU building. It is notable that just one year ago, JHA commented, "significant improvements have been made to the RU building." See JHA May 4, 2004 Status Report, pg. 56. In its latest report however, JHA does an about-face, and calls for the RU building's replacement. As previously discussed, additional major renovations to the RU building are in the works.

County officials are aware of these criticisms. County officials will continue to work together, and collaborate with Sheriff Sheahan and his staff, to provide satisfactory solutions in regards to both of these facilities.

### STAFFING

Over the past reporting year, the issue of jail staffing has dominated. As noted by JHA, the Board of Commissioners approved the addition of 275 correctional officers. Additionally, 8 civilian employees were added to expand the electronic monitoring program. In addition to the new correctional officer positions, CCDOC administrators have worked to reduce the number of correctional officers on "inactive", a.k.a, "zero pay" status, resulting in a gain of 79 active corrections officers. See JHA May 13, 2005 Status Report, pg. 77. The County Defendants commend efforts to fill all positions that have been budgeted for.

10

As JHA correctly notes, the County Defendants have commissioned a study of correctional officer staffing at the Jail to be performed by MGT of America. See JHA May 13, 2005 Status Report, pg. 64. The study is being directed by retired JHA President Michael J. Mahoney who has enlisted the expertise of several former Illinois Department of Corrections administrators.

The County Defendants are eager to learn the results and conclusions of Mr. Mahoney's study. JHA and Plaintiffs' counsel have continually based their arguments for increased staffing on the notion that, because the jail population has increased, staffing must likewise increase. Despite various estimates regarding the shortage of correctional officers, it remains unclear as to exactly how many officers are necessary to comply with the terms of the Decree. What is clear is that the number of correctional officers required under the Decree has little to do with the detainee population. Rather, the Decree as modified by an Agreed Order entered on July 23, 1996, specifies staffing levels based on living units, and generally requires one officer per living unit with some exceptions during the midnight shift when cross-watching is permitted. That is the relevant inquiry; an inquiry that has been lost in the discussion.

It is anticipated that the Mahoney study will go a long way towards determining whether the County Defendants are in compliance with the staffing requirements of the Decree. While the Mahoney study may indicate insufficient staffing levels, it is likewise possible that the County Defendants have already

11

budgeted for a sufficient number of correctional officers to comply with the Decree. Nonetheless, President Stroger and the Board of Commissioners will continue to work in a cooperative manner with the Court, and all of the involved parties, in complying with the terms of the Consent Decree.

Similar to the report of the Mahoney team, and as mentioned above, the report of the Trotter team will shed additional light regarding LOS issues. In its 2004 Status Report, JHA described the long LOS of 189.4 days as a chief contributing factor to Jail crowding. See JHA May 4, 2004 Status Report, pg. 44. Plaintiffs subsequently attempted to link long LOS of over six months, into their argument for the need to hire hundreds of additional correctional officers due to alleged extra burdens and a more volatile Jail atmosphere. See Plaintiffs' Motion for a Finding of Civil Contempt filed November 18, 2004, p. 4, ¶ 5. Plaintiffs claimed that "the duration of long-term stays at the Jail (e.g., more than six months) have increased . . . [and] have added to the burdens on Jail staff. . . ." Id. It appears that Plaintiffs' counsel may have unwittingly been proceeding under a false premise.

In its 2005 Status Report, JHA raises serious questions over the methodology it has used, and that the Court and the parties have relied upon, in formulating LOS data. JHA has disclosed that its "Snapshot" analysis ignores 30,000 detainees

who bonded out of the jail within 12 days. <u>See</u> JHA May 13, 2005 Status Report,

pg. 24. As stated by JHA:

> "Interestingly, the overall average length of stay for all detainees who exit CCDOC (the 2002 release cohort) is 50 days. This estimate is much lower than the 188 days calculated for detainees incarcerated at CCDOC in February 2005, because it includes over 30,000 detainees who bonded out from CCDOC with an average length of stay of 12 days."
> <u>Id</u>.

JHA explains this significant (50 days vs. 188 days) discrepancy regarding

LOS numbers as follows:

> "Generally, length of stay estimates based on 'snapshot' samples of detained individuals are longer (or higher) than estimates based on release cohorts, primarily because the snapshot sample include detainees who are still incarcerated (e.g., those who tend to stay longer). Release cohorts, on the other hand, contain information for all detainees who leave during a certain time period, including detainees who stay for brief periods of time, and thus are not reflected well in snapshot samples. Using different samples for estimating length of stay allows consideration of a greater number of issues affecting length of stay, and allows analysis of a broader range of detainee categories."
> <u>See</u> JHA May 13, 2005 Status Report, pg. 13, n.2.

Undoubtedly, excluding approximately 30% of the detainee population in

calculating LOS numbers is inappropriate. JHA's use of the "Snapshot" analysis

provides a distorted picture relative to both the overcrowding and the staffing

issues. The County Defendants submit that this methodology is patently flawed

and urge JHA to abandon it.

13

Accordingly, it appears that many of the recent actions related to the staffing issue have proceeded on incomplete or false assumptions. The County Defendants respectfully request that the Court withhold any judgments or conclusions regarding staffing until the Mahoney and Trotter reports are completed, and, the Court Monitor is allowed the opportunity to reconsider its methodology in formulating its data.

**HEALTH SERVICES**

Cermak Health Services (CHS) administrators continue to effectively respond to the reality of a jail population that is generally sicker today than in years past. An increasing number of prescriptions being written for detainees supports CHS administrators' belief that detainees arrive at the Jail in poorer health than in years past.

CHS administrators continue to be proactive and innovative in the provision of medical care to detainees and have expanded available services. In the past reporting year, CHS has begun intake screening of high-risk male inmates for Gonorrhea and Chlamydia. It is reported that over 20% of male detainees screened are infected with one of these sexually transmitted diseases.

CHS has expanded the practice of providing detainees with a multi-day supply of "blister packs" of certain drugs at intake. Medications that are part of this policy are those that do not have a potential for abuse, such as antibiotics, asthma, or blood pressure medication, rather than painkillers or psychotropic

14

drugs.

Since December of 2004, CHS has its own licensed and accredited Advanced

Life Support ambulance, and crew, available 24 hours per day/7 days per week.

Previously, all hospital transports were performed by a private ambulance vendor

or Chicago Fire Department ambulance. CHS administrators anticipate that the

new ambulance will average 1,000 runs per year and provide better and more

efficient service by saving precious time during medical emergencies.

CHS administrators look forward to the impending ban on cigarette smoking

throughout the CCDOC complex. It is anticipated that the ban will not only

improve the detainees' general health, but will enable CHS staff to provide better

health care. A significant number of detainees require asthma drugs. There is

hope that fewer detainees will present with severe exacerbations of asthma.

Similarly, there is medical evidence to suggest that nicotine breaks down the levels

of psychotropic drugs in a person's system, requiring higher doses and a more

frequent need to administer the drugs. The less that CHS staff needs to spend

treating these conditions and dispensing medications for them, the more time and

resources will be available for addressing other health needs.

CHS now employs a full-time physician who is a Board Certified infectious

disease specialist. The focus of this physician is the treatment of HIV and other

infectious diseases.

CHS has expanded on-site specialty medical services. For example, gastric

15

and colon endoscopies formerly performed at Stroger Hospital are now done at CHS. Not only does this provide detainees with quicker access to the procedure, it also reduces the burden to CCDOC staff who would otherwise be required to transport detainees to Stroger Hospital and guard them while there.

JHA suggests that the mere number of detainee grievances regarding medical care indicates that a review to determine the adequacy and accessibility of health services remains an "urgent and unmet need" for CHS. See JHA May 13, 2005 Status Report, pg. 107. This suggestion is misguided. There is simply no demonstrable nexus between the number of detainee grievances and the quality of health services provided by CHS.

Initially, it should be noted that CHS is fully accredited by the National Commission on Correctional Health Care (NCCHC). The accreditation process requires external peer review in which NCCHC, a private, nongovernmental association, grants public recognition to detention and correctional institutions that meet nationally established and accepted standards for the provision of health services. NCCHC has found that CHS meets these standards.

CHS administrators submit that a majority of inmate grievances are precipitated by detainees simply not knowing when their next appointment will be and becoming impatient. For example, a detainee is seen and treated for a medical condition and advised by the physician that he will receive follow-up treatment in two to three weeks. Frequently, the detainee will file a grievance on day 14, not

16

knowing that he has been scheduled for sick call on day 21. As evidence of this, and as JHA reports, "many inmates received the medical attention they desired by the time the grievance was answered." See JHA May 13, 2005 Status Report, pg. 111. CHS administrators are aware of this issue. However, providing detainees with appointment cards as is done in a traditional doctor's office, has proven to date, to be impractical at the CCDOC.

Likewise, many grievances are received regarding scheduling for specialty clinics or elective surgery at Stroger Hospital. Elective procedures are scheduled by Stroger Hospital staff based solely on medical need. It must be understood that simply because an individual is a detainee at the CCDOC, does not entitle him to priority over someone who is not in jail, is sicker, and who may have been waiting longer for a surgical procedure.

JHA is critical regarding grievance responses "that provide no indication of whether services were actually provided, what services where provided or when the services were provided." See JHA May 13, 2005 Status Report, pg. 111. JHA's criticism ignores the privacy restrictions dictated by the Health Insurance Portability and Accountability Act (HIPAA). HIPAA forbids disclosure of certain information including an individual's past, present or future physical or mental health condition, and, the provision of health care to the individual. Since individuals other than those who are on the staff of CHS review grievance responses, the responses are intentionally drafted to not violate HIPAA

17

requirements. CHS administrators are willing to discuss including more detailed information in grievance responses, while maintaining strict compliance with HIPAA requirements, with JHA and Plaintiffs' counsel.

## CONCLUSION

The County Defendants, President John H. Stroger, Jr. and the Board of

Commissioners of Cook County, continue their dedication to consistently improving

the conditions of confinement for all detainees at the CCDOC.  CCDOC

overcrowding and correctional officer staffing remain priority issues for the County

Defendants.  The County Defendants have constantly improved the facilities of the

CCDOC and have provided Sheriff Michael Sheahan the resources to maintain and

expand supervised alternative release programming during this reporting period.


Respectfully submitted,

RICHARD A. DEVINE
State's Attorney of Cook County


By: _____

Donald J. Pechous
Supervisor
Torts/Civil Rights Litigation
500 Richard J. Daley Center
Chicago, Illinois 60602
(312) 603-3378

By: _____

Jamie M. Sheehan
Assistant State's Attorney
Torts/Civil Rights Litigation
500 Richard J. Daley Center
Chicago, Illinois 60602
(312) 603-6772

19