KC **FILED**

Atty No. 90663                    Our File NO. 67617-DFG          JUL 1 4 2005

**MICHAEL W. DOBBINS**
CLERK, U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DAN DURAN, et al.                          )
                                           )
                    Plaintiff,             )
                                           )
          v.                               ) No. 74 C 2949
                                           ) Judge George M. Marovich
MICHAEL F. SHEAHAN, Sheriff of             )
Cook County, et al.                        )

### NOTICE OF FILING

To:    All Counsel of Record
       (See attached Service List)

PLEASE TAKE NOTICE that on July 14, 2005, we caused to be filed with the Clerk of the United States District Court for the Northern District of Illinois, Eastern Division, that attached: **Defendant, Michael F. Sheahan, Sheriff of Cook County's 2005 Status Report and Response to John Howard Association Court Monitoring Reported dated May 13, 2005.**

QUERREY & HARROW, LTD.,

By:    _____
       Attorneys for Defendant, Michael F. Sheahan,
       Sheriff of Cook County

Daniel F. Gallagher
QUERREY & HARROW, LTD.
175 W. Jackson, Suite 1600
Chicago, Illinois 60604
(312) 540-7000

67617-DFG
Duran v. Michael F. Sheahan, Sheriff of Cook County
Case No. 74 C 2949
Judge George M. Marovich

## SERVICE LIST

Robert Lehrer
Diane L. Redleaf
Lehrer & Redleaf
36 South Wabash Avenue
Suite 1000
Chicago, IL 60603
(312) 332-2121
(312) 332-1717 – facsimile
*Attorneys for Plaintiff*

Locke E. Bowman
The MacArthur Justice Center
1111 East 60th Street
Chicago, IL 60637
773/753-4405
*Additional Attorneys for Plaintiff*

Patrick T. Driscoll, Esq.
Office of the State's Attorney
500 Richard J. Daley Center
Chicago, IL 60602
312/603-5450
312/603-5735 – facsimile
*Attorneys for Cook County Board of Commissioners*

Charles Fasano
John Howard Association
300 West Adams
Suite 617
Chicago, IL 60606
312/782-1901
312-782-1902 – facsimile

## PROOF OF SERVICE

I, Jennifer Hyland, being first duly sworn, on oath deposes and states that an exact copy of the attached was served to all counsel of record by mailing same in a properly stamped, addressed envelope to the above-named attorney(s) and depositing same in the U.S. Mail Chute located at 175 W. Jackson, Chicago, Illinois on July 14, 2005.

{X}    Under penalties as provided by law pursuant to IL.REV.STAT. CHAP 110 SEC 1-109, I certify that the statements set forth herein are true and correct.

Atty No. 90663                    Our File NO. 67617-DFG    KC **FILED**

IN THE UNITED STATES DISTRICT COURT       JUL 1 4 2005
FOR THE NORTHERN DISTRICT OF ILLINOIS   MICHAEL W. DOBBINS
EASTERN DIVISION        CLERK, U.S. DISTRICT COURT

| | |
|---|---|
| DAN DURAN, et al. | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 74 C 2949 |
| v. | ) Honorable Judge George M. Marovich |
| | ) |
| MICHAEL F. SHEAHAN, Sheriff of | ) |
| Cook County, et al. | ) |
| | ) |
| Defendant. | ) |

## DEFENDANT, MICHAEL F. SHEAHAN, SHERIFF OF COOK COUNTY'S 2005 STATUS REPORT AND RESPONSE TO JOHN HOWARD ASSOCIATION COURT MONITORING REPORT DATED MAY 13, 2005.

## INTRODUCTION

Michael F. Sheahan, the Sheriff of Cook County, ("Sheriff"), by and through his attorneys, Daniel F. Gallagher and Querrey & Harrow, Ltd., presents this status report covering the period from 2004 through May 2005 for the purpose of demonstrating the significant progress which has been made in terms of achieving compliance with each of the provisions of the Duran Consent Decree and to respond to the status report of the John Howard Association dated May 13, 2005.

This is the first time since the entry of the 1982 Consent Decree that the Sheriff has filed a separate status report. The Sheriff welcomes the opportunity to expound upon and describe the positive improvements implemented since the last report and to set forth in more detail, plans and recommendations which, if funded, could result in

1

elimination of the overflow population in the County jail within the next twenty-four months. Of course, as with most proposed solutions, they will require a moderate increase in appropriations and the cooperation of the County Board.

As will be seen in this report, Sheriff Sheahan and his staff have developed many innovative plans to reduce the population of the County jail and to comply with the Duran Decree, while at the same time providing for the security of the citizens of Cook County. Up until this year, compliance with the Decree has been done without an increase in staff and without a substantial increase in funds from the County. Nevertheless, in several areas, the Sheriff has devised and implemented detention alternatives for the release of pre-trial detainees and has also provided programs for sentencing alternatives. The supervised alternative release programs are administered by the Sheriff's office through the Cook County Department of Corrections ("CCDOC"), the Cook County Department of Community Supervision and Intervention ("DCSI"), and the Department of Women's Justice Services ("DWJS"). The Sheriff and his staff and the foregoing departments have worked diligently to create and expand programs which address the extremely complex social and criminal issues presented by the large and diverse detention population in an attempt to reduce overall jail population while maintaining security in the community, and also offering participants in the programs opportunities to achieve rehabilitation, personal development and preparation for a productive life after the disposition of criminal charges. The Sheriff and his Department leaders are dedicated to providing constitutionally sound conditions for pre-trial

2

confinement and alternative detention mechanisms, and for safely managing the largest single site correctional facility in the United States.

It should be noted that one of the factors which has helped to ameliorate overcrowding in the Cook County jail is the order entered by this court on November 14, 2003 which permits the Sheriff to transfer custody of any persons housed at the CCDOC to the IDOC who had previously been sentenced to IDOC for an unexpired sentence of confinement. Since the entry of the order of modification on November 14, 2003 through April of 2005, the CCDOC has been able to transfer to the IDOC almost 5,000 inmates. In the seventeen and a half months (17 ½) months from November 14, 2003 through April of 2005, the Sheriff's office has transferred an average of 214 inmates per month to IDOC who would previously have been housed at the CCDOC. The Sheriff is grateful to this court for the order modifying the decree permitting the transfers. It is believed that the order permitting transfers provided the initial impetus for the sustained decline in average inmate population which has taken place since 2003.

I.    **POPULATION AND CAPACITY**

As pointed out in the John Howard Association 2005 Monitoring Report (JHA'05 Report), there is a slight downward trend in the average daily population and a 33.3% drop in the average overflow population since 2002. (JHA'05 Report, pp. 4 and 5) While the trend shows a decrease in average daily population and a significant decrease in overflow population since 2002, the fact remains that the overflow problem is a result of

3

the unpredictability of the receipt of inmates in various classification levels. Each jail division has a different bed space capacity for differently classified inmates. As pointed out in the JHA'05 Report, the overflow population seems to be concentrated in Divisions IV, V, VI and X. The ebb and flow of the daily population in the various classes of inmates is not within the control of the CCDOC. Nevertheless, as the JHA'05 Report points out, if the decline in average inmate population continues at its recent pace, there would be no overflow population in 24 to 36 months.

Sheriff Sheahan agrees with JHA that new, sustained efforts in accelerating case dispositions and expanding other jail diversion programs are necessary in order to reduce or eliminate the overflow population.

It should be pointed out that the average length of stay for female inmates has increased significantly (16%) even though the overall length of stay for inmates dropped by 1%. This should be looked at closely to determine whether the increase in the length of stay for female inmates is an aberration or if there is a cause for it which can be addressed.

## A.    RELEASE MECHANISMS

The Sheriff of Cook County has continued throughout the reporting period to maintain, devise, and implement pre-trial release programs, many of which involve linkage to community groups and non-governmental organizations. The Cook County Department of Community Supervision and Intervention (CCDCSI) administers the

4

Sheriff's Electronic Monitoring Unit (SEMU), the Day Reporting Center (DRC), and the Pre-Release Center (PRC).

Pursuant to the District Court's March 22, 1983 Memorandum Order, the Sheriff also administers the Administrative Furlough Program (AMF) (f/k/a Sheriff's I-Bond Program).

In 1995, pursuant to an advisory council made up of several prominent experts, the Sheriff's Office created the Department of Women's Justice Services (DWJS). The purpose of DWJS was to create and utilize gender and culturally responsive programs and services for female pre-trial detainees. The DWJS administers the Sheriff's Female Furlough Program (SFFP) which is a day reporting program for women. In addition, the DWJS has devised and implemented the Maternity Objective Management Program (MOMs). The MOMs program provides for a sixteen-bed unit for pregnant and post-partum addicted women which supplies residential services with and/or apart from newborns. It is remarkable that, since instituting the MOMs program in December of 1999, over 144 babies have been born drug free to participants in the program who began the program as chemically dependent. DWJS also administers the women's residential program (WRP) which is an on-site jail program designed to provide inmates with services ranging from life skills training to parenting education and mental health programs.

The Sheriff's Office also administers the Impact Incarceration Program (Cook County Boot Camp) and the Sheriff's Work Alternative Program (SWAP) which allows

5

offenders to provide community services as part of their sentences. The Boot Camp and the SWAP programs are not alternative release programs but provide the judiciary with an alternative to sentencing individuals to incarceration in the County jail.

### ADMINISTRATIVE MANDATORY FURLOUGH PROGRAM (AMF)

AMF is mandated by the court's March 22, 1983 Memorandum Order. Individuals eligible for the AMF Program are held in custody for a minimum of three (3) days before being released into the AMF Program. This gives the Circuit Court of Cook County an opportunity to first review and set an appropriate bond for an individual. The three-day waiting period permits the CCDOC to make a comprehensive criminal history analysis under strict classification guidelines. The waiting period also assures that a criminal defendant appear in court prior to the issuance of an AMF bond. Some detainees choose to post a cash bond if one has been set rather than waiting for the three-day period to expire. The AMF program is clearly the least utilized pre-release program due to the fact that it does not require any supervision or reporting. Both the Sheriff of Cook County and the John Howard Association agree that Sheriff-issued I-Bonds are inappropriate for use on a large-scale basis as an alternative release program. The other programs which the Sheriff has devised and implemented are far more reliable and successful in reducing overcrowding at the jail.

The JHA'05 report accurately sets forth that AMF releases between 2004 and 2005 decreased by 75.4%. Furthermore, from July of 2004 until December of 2004, I-Bonds

6

were issued on the average of only 3.5 per day during those months. Finally, during the first four (4) months of 2005, the Sheriff's Office has issued slightly less than one I-Bond daily. Frequently, the I-Bonds are issued to female defendants most of whom are not charged with crimes of violence or do not have a criminal history with convictions for violent crimes.

The Sheriff believes that some modification of the AMF program should be considered. Perhaps AMF bonds should be restricted to those individuals who have completed 120 days in the Electronic Monitoring Program. In that circumstance the CCDOC would have sufficient time and experience with the individual to determine whether an inmate would be a good candidate for an AMF bond which does not require supervision or reporting.

### DEPARTMENT OF WOMEN'S JUSTICE SERVICES (DWJS)

The DWJS administers three highly successful programs which include the Sheriff's Female Furlough Program (SFFP), a female day reporting program. The participants report to the program at the jail daily for treatment and case management services and return to their homes each evening to care for their families. In the evenings the majority of the participants are electronically monitored while remaining in their homes. The program provides assistance to the participants in many areas including substance abuse treatment, literacy, parenting, life skills, and mental health. At the present time the SFFP is designed to accommodate 100 participants in its daily

7

population. Nevertheless, the program is averaging approximately 158 women each day which is sorely stretching present resources and personnel.

The Sheriff and the administrators of DWJS have proposed a plan to significantly expand the SFFP program. The proposal would require the building of a facility on a portion of the property which is already occupied by the Cook County Boot Camp. The building would be a simple one which could be constructed at low cost due to the fact that it would simply serve as a day reporting center where program instruction could be carried out. The facility would not provide residential or custodial care for the participants so it would not have to be built according to correction institution specifications. The Sheriff and his staff have been in contact with budgetary personnel of the County Board who have agreed to earmark $2.2 million dollars for such a facility. A proposed plan was submitted to the County Office of Planning and Policy and has been approved. A copy of a drawing of the proposed structure is attached as Figure 1.

The building is designed in such a way as to give the potential for adding a second floor at minimal cost if additional space is required in the future.

The construction of this facility and the transfer of the SFFP program to the facility would free up portions of Division VIII and would allow the expansion of the program far beyond the present 158 participants, further reducing the population of the County jail.

8



**COOK COUNTY SHERIFF'S OFFICE
WOMEN'S JUSTICE SERVICES CENTER
PROPOSED PLAN
SCALE: 1/16" = 1'-0" (DO NOT SCALE DWG.)**

Figure 1

Boot Camp

**THE WOMEN'S RESIDENTIAL PROGRAM (WRP)**

Although not an alternative release program, the Women's Residential Program provides integrated services dealing with many complex issues that impact women inmates. The unit occupies two tiers in Division VIII and currently has 120 beds. However, the program averages 137 participants per day. Substance abuse and mental health treatment services are provided through agencies which are awarded contracts based on meeting requirements set by DWJS for gender and culturally responsive treatment services. There are three phases in the program, including a phase to prevent relapses and a phase to ease transition back into the community.

Due to the increase in the Cook County jail's female population, the Women's Residential Program should be expanded beyond the present 120-bed capacity. Furthermore, successful participants in the early phases of the program could be placed in the SFFP program if more supervisory resources were available.

**THE MOMs PROGRAM**

The MOMs program is a sixteen-bed, off-site residential unit for pregnant and postpartum addicted women. A recovery home allowing newborns to stay with their mothers is available to participants. Outpatient services are offered through Project Safe, a special outpatient program for women that provides childcare, intervention, prevention, diagnosis, and treatment for chemically dependent mothers. Health education services are also provided, as well as specialized counseling services for

9

substance abuse, mental health disorders, and domestic violence. It also assists participants in providing housing alternatives.

As set forth earlier, the program has resulted in the birth of 144 drug-free infants during the program's existence. It should be noted that the average cost for medical services provided by the County during the first year of life to children born addicted due to their mothers' chemical dependency exceeds $250,000.00 per child.

### EXPANSION OF THE DWJS PROGRAMS

The DWJS programs are extremely efficient and cost effective. DWJS utilizes an integrated model that addresses substance abuse, mental health, and physical health issues. It also incorporates supportive services such as GED/literacy, job training/placement, life skills, anger and stress management, parenting, childcare, housing, family reunification, and other services. This integrated model creates a safe, supportive treatment environment for women in the criminal justice system.

The leaders of the DWJS program have created links with at least 59 community service and non-governmental organizations which currently assist in providing vital programs and services to female detainees. The bonds forged with these organizations by DWJS leaders have been accomplished through their dedication to providing a program designed to break the intergenerational cycle of trauma, addiction, and crime that is too frequently visited upon women and their children.

In October of 2004, DWJS began collaboration with the Northwestern University Feinberg School of Medicine under an exploratory grant to Northwestern University

10

from the National Institute of Health – NIDA. Northwestern University and the Chicago Department of Public Health are studying the DWJS model to scientifically validate its programs.

The United States Department of Justice's National Institute of Corrections (NIC) has reviewed the integrated model developed by DWJS and has named DWJS one of twelve model programs in the United States.

Presently, there are approximately 311 women receiving services through DWJS. With the construction of the new building within the next 18 months, it is anticipated that DWJS could accommodate at least 100 additional women in SFFP. However, with the addition of the new building, it will be necessary to fund additional positions for staff members and correctional rehabilitation workers (CRWs) to professionally operate the programs.

### SHERIFF'S ELECTRONIC MONITORING PROGRAM (SEMU)

The SEMU operated by the DCSI is, by all accounts, an extremely well-managed extrajudicial release program. It is also the largest alternative release program administered by the Sheriff. The JHA'05 report notes that 11,522 participants successfully completed electronic monitoring in the year 2004. During the year 2005, the SEMU has averaged 1,627 daily participants.

Participation in SEMU had previously been limited to individuals who had an operational landline phone in their residence, which was necessary for proper monitoring. DCSI administrators have acquired and deployed cellular monitoring

11

equipment which allows inmates who would have been unable to participate because they had no landline phone, to now be released from custody.

As the court is aware, the County Board has authorized the purchase and implementation of 250 additional electronic monitoring units. The 2005 budget has also authorized the funding of 33 additional personnel for the electronic monitoring unit. However, there are still certain personnel problems which have been identified by DCSI, by the Northwestern University Center for Public Safety study of the electronic monitoring program done in 2003 and by the John Howard Association. The principal personnel difficulty recognized by all of the above is the lack of supervisory positions in the SEMU.

The Northwestern University Center for Public Safety study noted that approximately three dozen Grade 16 investigators have been appointed as "acting" supervisors. The study recommended that the "acting" Grade 16 supervisor positions be replaced with actual supervisor positions. The Northwestern Study noted that since at least 1994, the SEMU management has recognized and requested that Grade 16 acting supervisors be reclassified and upgraded to actual supervisor positions. This need has been a part of the Sheriff's Fiscal Year Budget requests for the last ten years. In addition, the JHA reports to this court since 2001 have indicated that Cook County officials should give serious consideration to reclassification of some staff positions in the SEMU program. In the JHA'05 report it is once again stated, "...maintaining this level of supervision is a laudable achievement under any circumstances, and the ability

12

of the EMP (Electronic Monitoring Program) administrators and staff to do so without additional staff with a long overdue reclassification of supervisory positions is particularly commendable." (JHA Report, p. 37) The addition of 250 additional units and 33 additional personnel absolutely requires a review and reclassification of supervisory positions for SEMU. The sooner the 250 additional units can be employed with proper supervision, the sooner space will be made available in the County jail.

### THE DAY REPORTING CENTER (DRC)

Since its inception in March of 1993, the Day Reporting Center has continued to provide structured treatment services and supervision to male participants who have successfully participated in an electronic monitoring or other release programs. Again, the DRC attempts to provide an integrated model for participants in the form of supportive life management services. After a one-week orientation program following admission, participants are assigned to one of approximately a dozen program tracks.

DRC provides educational programs for adult basic education as well as GED preparation. Additional classes are provided that deal with anger and stress management, parenting, and substance abuse education and treatment. DCSI officials constantly review the SEMU participants to attempt to identify candidates for transition into the DRC program. From January of 2004 until April of 2005, the Day Reporting Center averaged 571 participants per day. It is believed that this number will increase to over 600 participants per day, provided that the SEMU is properly staffed, since DRC relies on the SEMU for referrals.

## PRE-RELEASE CENTER (PRC)

As set forth in the JHA'05 Report and other previous reports, the 300-bed pre-release center has been kept virtually filled on a daily basis since mid-1994. The PRC has proven to be a safe, productive and cost effective alternative to pre-trial detention. It was originally designed to provide treatment opportunities for substance abusers. More recently, however, the program has also accepted individuals with histories of domestic violence.

Due to the success of the Pre-Release Center, a plan has been in the works since 2002 to expand the Center by another 150 beds. Due to some procurement problems and difficulties regarding the HVAC system for this facility (as more fully set out in the JHA'05 Report), the additional 150 beds are not yet on line as of this writing. However, it is believed that by the time of the status hearing before this court in August, the 150 additional beds will be available for occupancy. It should also be noted that for the first time in approximately 10 years, additional staffing was approved and budgeted by the County Board which will enable the Sheriff to fully staff the Pre-Release Center.

Every Pre-Release Center participant is selected from the general CCDOC population based upon his willingness to participate in substance abuse treatment provided by the Human Resources Development Institute, Inc. Since some members of the judiciary have begun using the Pre-Release Center as a sentencing option for domestic violence offenders, the Center has instituted classes and education relating to issues of domestic violence. The sentencing of offenders to PRC is an acknowledgment

14

by the judiciary of the effectiveness of the program. However, positions occupied by convicted offenders reduce the availability of the program for pre-trial detainees.

Bringing on line the additional 150 beds and filling them to capacity will substantially reduce the overflow population of the County jail.

### COOK COUNTY BOOTCAMP (CCBC)

The CCBC program continues to be a successful alternative detention program. A participant may be in the program for up to a maximum of one (1) year. Each participant's program begins with an eighteen-week residential incarceration phase followed by a ten-week period of community supervision (i.e., after care). Subsequent to the custodial phase, a participant is released on electronic monitoring. During the community supervision portion of the program, participants may be assigned to the Day Reporting Center, or may be permitted to work or attend school. The CCBC has a capacity of 240 available beds. It has operated at or near capacity since its inception in 1997.

As pointed out in the JHA'05 Report, 74% of CCBC participants successfully completed the one-year program with 45% of the participants employed at the end of that time. "Of the 2,280 individuals who successfully completed the one-year program and are now two years removed from the program, 2,118 of these participants remained incarceration-free for a 92% success rate which is notably higher than in previous years." (JHA'05 Report, p. 50) The CCBC program provides individuals with academic programs, and job training and placement, in addition to methods for improving self-

15

discipline. The educational phase, in addition to the job training and on-site placement services, are the distinctive features which have made the CCBC more successful than other boot camp programs.

### B. JAIL CAPACITY:

### FACILITY STATUS AND PLANNING ISSUES

As set forth in the JHA '05 Report, there are constant renovation and maintenance issues in the county jail facility which affect bed space and capacity. The Sheriff has instructed CCDOC administrators to maintain a daily executive director's log which accurately calculates the total population, the capacity, and the available beds in all of the divisions of the CCDOC. This information is provided to the JHA on a regular basis and also to the Cook County Department of Facilities Management (CCDFM).

The Sheriff cannot emphasize enough how important it is that the DWJS facility, which would house the Sheriff's Female Furlough Program, be completed at the earliest possible opportunity to help alleviate overcrowding. Furthermore, the DCSI is gearing up to put into place the additional 250 electronic monitoring units. However, as cautioned earlier in this report, maximum use of the SEMU can only be attained through the additional staffing of supervisor positions.

16

II.  **CONDITIONS AND COMPLIANCE WITH THE CONSENT DECREE**

   A.  **ENVIRONMENTAL HEALTH**

As pointed out in the JHA '05 Report, a great deal of progress has been made regarding some chronic mechanical maintenance problems in the CCDOC facilities. CCDOC staff members have consistently continued to submit work orders during the period in question to the Cook County Department of Facilities Management (CCDFM). Division 2 is being renovated and new windows, lighting, plumbing and heating systems are being installed in dormitories 1, 2, and 3. Dormitory 2 is under renovation at this time. There is frequently a significant delay between the time at which CCDOC staff submit work orders and the time that needed repairs are made.

The Sheriff has previously requested reconstruction of the receiving room in Division V. The Sheriff's request for reconstruction and/or renovation of the receiving area has been rejected by the County. The construction of a new receiving room area should be addressed by the County Board of Commissioners at the earliest possible opportunity. At the present time, the receiving room is too small for the number of detainees being admitted daily and being processed to and from various court locations every day. A new receiving room should be designed and constructed so that male and female inmates may be processed in completely separate areas. Furthermore, a new receiving room should have bullpens with sufficient toilet facilities so that correctional officers do not have to escort inmates from the bullpens to toilet facilities and back

17

again to the bullpens. Additionally, a new receiving area must have an adequate health services area so that inmates may be screened adequately and efficiently.

Finally, the inadequacy of the present receiving room presents safety and security problems for both the correctional staff and the male and female inmates who are admitted and transported daily to and from the receiving room.

### CENTRAL KITCHEN

It is pointed out in the JHA Report that many of the issues with the central kitchen have been resolved, and obsolete kitchen equipment has been removed and replaced with equipment of a more modern nature.

### GENERAL MAINTENANCE ISSUES

As has been pointed out previously, the CCDOC continues to report maintenance problems and to submit work orders to the CCDFM. The Sheriff, however, does not have control over facilities maintenance or repair.

It should be noted that the CCDOC has obtained and distributed storage boxes to all inmates for storage of their personal property. The CCDOC has procured and inventoried sufficient storage boxes for newly admitted inmates.

### B.  PERSONAL HYGIENE

The JHA '05 Report points out that CCDOC has done a good job of supplying inmates with clean clothing, linen and mattresses, in addition to personal hygiene items such as soap, toothpaste, toothbrushes, and toilet paper throughout the year. JHA has

18

also indicated that hygiene items are provided and replenished on a regular basis for inmates.

The JHA was concerned with the issuance of damaged mattresses to inmates long after they should have been discarded. That problem is being addressed by the CCDOC and mattresses will be routinely inspected and taken out of service if they become damaged to the extent that they are no longer usable.

The JHA report was extremely complimentary with regard to the hygiene at the Pre-release Center. There is no question that the installation of commercial washers and dryers in the facility has aided in upkeep of inmate clothing and linen.

C.    **FOOD SERVICE**

Food service is provided by Aramark, Inc., pursuant to a contract with Cook County. The CCDOC employs a registered dietician who regularly inspects conditions in the central kitchen, monitors menu plans and tests meals that have been prepared. As noted in the JHA Report, the CCDOC dietician monitors contract specifications and requires meals to be returned to the central kitchen if she concludes that they were improperly prepared or failed to meet contract specifications.

The CCDOC registered dietician also oversees the preparation of meals for inmates with special diet requirements owing to some inmates' medical conditions. The CCDOC registered dietician coordinates with the Cermak Health/Service (CHS) health providers to insure that inmates with prescribed dietary restrictions receive special medically approved meals.

19

In early 2004, CCDOC acquired thousands of new, insulated plastic trays which were supposedly designed to keep food warm. The trays proved to be difficult to clean and the plastic surface was fragile, permitting it to crack and allowing water to seep into the insulation material. The CCDOC has identified and researched a new tray which is made of an environmentally safe composite product which is solid and will not permit cracking and thus, leakage into the internal insulation. CCDOC has requested that Cook County officials authorize the purchase of the new trays, believed to be much more durable than the ones presently in use.

The CCDOC is still awaiting the arrival and installation of new tray washing equipment which will aid in the task of cleaning and sanitizing food trays.

### D. STAFFING

Sheriff Sheahan has, for the last ten years, regularly requested the funding of additional correctional officer and supervisory positions for the CCDOC. As we have pointed out earlier in this report, there is a need for additional supervisory positions in several departments within the CCDOC.

In large part, due to the insistence of this court, the Cook County Commissioners' fiscal year 2005 corporate budget provided funding for 269 additional correctional officers, six security supervisors for the Pre-Release Center and 8 civilian employees for the Electronic Monitoring Program. The JHA '05 Report accurately notes that 217 CO's will be assigned to the CCDOC for general jail security while 66 correctional officers will be divided among the SEMU and the PRC. It should be noted,

20

however, that even though the County Board funded 275 new correctional officer positions, there were no funds to train these individuals. The Sheriff's training budget was reduced 50% in 2002 and was completely eliminated in fiscal years 2003 and 2004. The Sheriff's office has been required to utilize funds received from the Social Security Administration that had accrued to the Office of the Sheriff due to a contract with Social Security. But for the utilization of these funds which had accrued over a substantial period of time, the new positions appropriated could not have been filled because there was no training budget. It should be noted that the Social Security Administration funds, although a recurring item, accrue at a very slow pace. The use of these funds for training during fiscal year 2005 is a one-year phenomenon that cannot be repeated. Therefore, it is imperative that a training budget be restored for the Office of the Sheriff.

As soon as the funding for the new correctional officers was in place, the Sheriff began training classes of cadets. Each class of cadets must complete twelve weeks of training in order to be eligible for state certification and graduation from the Academy. Due to the dedication of the Training Academy staff, the Sheriff is pleased to report that training will be completed for all of the newly funded positions by mid-September, 2005.

The JHA '05 Report also accurately sets forth that the Sheriff has filled approximately 79 previously inactive positions.

Although funding additional CO positions and filling inactive positions is a welcome change, there should be no misunderstanding that the Cook County

21

Department of Corrections is still woefully understaffed. The JHA '05 report at pages 80 and 81 points out that between November of 1996 and April of 2005, the County Jail has experienced considerable growth in capacity and available bed space, as well as a considerable increase in terms of the average daily inmate population. Yet the number of CO's remained unchanged. The Sheriff maintains that there is still a significant shortage in the total number of CO's required to operate Cook County Jail. There are insufficient officers to meet facility operational and security needs, as well as the transportation of prisoners to court, medical facilities and other programs. There are also insufficient officers to provide a relief factor in order to adequately staff housing units on a 24-hour basis seven days a week. The Sheriff wishes to emphasize that complete compliance with the Duran Decree's mandated staffing requirements cannot be accomplished without increased staffing levels.

The Sheriff welcomes the staffing study proposal which has been ordered by this court and which was contracted for by the Cook County Board of Commissioners.

The Sheriff wholeheartedly agrees with the recommendation made by the JHA that the Cook County Board of Commissioners' Department of Correction Subcommittee and the Law Enforcement and Corrections Committee continue to meet with the Sheriff and other representatives of the criminal justice system to regularly discuss topics relating to compliance with the Duran Decree. The criminal justice system is not actually a system unless all of its component parts have agreed upon objectives and goals and all of the components of the system are adequately funded and

22

staffed.  Clearly, this has not always been the case in Cook County.  The only way that the system will work efficiently and constitutionally will be if the leadership of the integral parts of the system meet regularly to discuss present conditions and future needs and agree to address those matters in a timely way.

### E.    OVERCROWDING

What additional programs, services, or other plans can be implemented to insure that the overflow is reduced or eliminated? The Sheriff believes that the most reliable and efficient way to continue to reduce population is to decrease the length of stay by inmates by increasing the processing and disposition of inmates' cases.  As of May, 2005, JHA reports that 5.5 per cent, or roughly 550 inmates, had been held at the Cook County Jail for 3 years or more.  (JHA '05 Report, p. 16, footnote 3)  In addition, it is noted that inmates who are found "not guilty" have an average length of stay in the County Jail of 215 days.  Inmates whose cases result in early termination due to the prosecutor's decision to drop charges, *nolle prosequi*, or due to findings of no probable cause by the court, nevertheless make up almost 5% of all days served by inmates.  At page 19 of the JHA'05 report Table 1.5 summarizes the length of stay for different released inmates during calendar year 2002.  It should be noted that a total of 482,163 days were served by inmates who were subsequently released with no further legal action.  If such cases were terminated at an earlier stage, there would be a significant reduction in jail population.

23

As of July 14, 2005, 47 inmates have been incarcerated in the County jail for 4 to 5 years and 32 inmates have been incarcerated in the County jail for more than 5 years.

The JHA'05 report points out at page 16 that "Despite the passage of 17 years and a doubling of the jail population . . . the prevalence of prolonged jail stays remains a fact of life in Cook County. We believe that it is precisely this kind of persistence over decades that has contributed to the acceptance of such delays on a large scale as usual custom and practice in the Cook County justice system." (JHA'05 report at page 16). The Sheriff remains optimistic that with the continued assistance of this court, and with the cooperation of the Cook County Board of Commissioners and the leaders of the judiciary, State's Attorney's and the Public Defender's offices, the goal of reducing the length of stays and eliminating the overflow population of the County Jail can be achieved.

The CCDOC has reached out to community service organizations and non-governmental organizations in order to provide assistance to inmates to ease the overflow population. The Sheriff suggests that the Chicago Bar Association be contacted in an effort to provide pro bono or court appointed legal services for some inmates which would result in a decline in the length of stay. The CBA has traditionally been willing to cooperate with the criminal justice system to provide effective assistance of counsel when requested or appointed by the court. Another avenue which might be explored would be transferring the cases of low risk non-violent offenders to one or

24

more of the 20 different courthouse facilities throughout the County to reduce the excessive number of cases pending in the criminal courts at 26th and California.

The Sheriff looks forward to working with the County Board, the Judiciary and the State's Attorney and Public Defender's office in order devise and implement plans and to reduce overcrowding including court reform and accelerated case processing.

E.    ACCESS TO LAW LIBRARIES

The JHA '05 Report recommends that CCDOC officials pursue the acquisition of a computerized legal research system. It should be pointed out that every division at the CCDOC has a law library staffed by a law librarian. Although the libraries do not have a centrally linked network, computerized legal research is and has been available in each library for some time. Each of the libraries in the CCDOC has CD-ROM capabilities and the CCDOC purchases computer disks from both Lexis-Nexis and Thompson-West, containing the most recent case law. Law librarians are also available to assist inmates in conducting legal research. Although the CCDOC would welcome the opportunity to acquire a centrally linked computerized legal research system, budgetary constraints do not permit the implementation of such a system at this time.

F.    OTHER PROGRAMS AND SERVICES

The Sheriff joins with the finding of the JHA that there is an insufficient number of correctional rehabilitation workers (CRW's) to adequately provide important services to inmates at the CCDOC. It is accurately reported by the JHA that the staffing of CRW's has not increased since the early 1980's when the inmate population was 50% of

25

its current size. The addition of CRW's, which would alleviate perceived problems which exist in the inmate grievance procedure, are absolutely necessary for the expansion of the Sheriff's Female Furlough Program and Women's Residential Program.

The CCDOC believes that it is in need of an additional 15 CRW's in order to maintain adequate service to the inmates.

## G.   VISITING

The supervision and provision of visiting privileges is an enormous and labor-intensive task. Nevertheless, the CCDOC has done an exemplary job of accommodating visitors and implementing reasonable visiting procedures and practices.

The Sheriff has brought on line at CCDOC facilities an Ion Scanning System which will be placed at all entrances to the CCDOC. A similar type of scanning equipment has been used successfully by the United States Department of Justice in many of its facilities for the last few years. The equipment will detect the presence of drugs and other contraband secreted on visitors and also on staff. The employment of such equipment will improve security at the jail compound for the inmates and staff by preventing illegal substances and contraband from being brought into the jail. The CCDOC has developed procedures in utilizing the Ion Screening system which should not affect the speed with which visitors can be screened and cleared for entrance into the jail.

26

### H.    HEALTH ISSUES AND SERVICES:

In an effort to promote a healthier environment, the Sheriff of Cook County has issued a ban on smoking in the County Jail by inmates and staff. The ban is being imposed incrementally to allow smokers to gradually decrease their dependency upon smoking materials. As of August 1, 2005, no cigarettes or other smoking materials will be permitted in the County jail. Signs will be posted at all entrances warning inmates, visitors, and staff members that smoking materials will be considered contraband.

Sheriff Sheahan is deeply concerned about cutbacks which have been imposed on Cermak Health Services which provides medical screening and treatment to CCDOC inmates. Several positions in CHS have been eliminated and restrictions have been placed on the use of overtime. Furthermore, many jail divisions have health providers on site for only 16 hours daily, instead of 24 hours. The number of CHS personnel assigned to screening for inmates has been cut and various diagnostic procedures, previously performed on new inmates, have been discontinued. The Sheriff believes that this situation has resulted in several inmates being permitted admission into the jail when, in fact, they should have been assigned to a hospital for acute care.

The CCDOC staff is not medically trained and is not equipped to diagnose or treat inmates who should be hospitalized. Furthermore, the CCDOC staff is not trained or equipped to render any medical opinions. The Sheriff has absolutely no control over the provision of healthcare services in the County jail. All healthcare services are provided by Cermak Health Services under the auspices of the Cook County Board of

27

Health. The reduction in services provided by Cermak Health Services is both alarming and dangerous.

## I.    GRIEVANCE PROCEDURES:

The grievance procedures set forth in the Duran Decree set time limits for all grievances without respect to the type of grievance. The JHA '05 Report refers to responses to five complaints involving alleged assaults by staff and/or other inmates. The five complaints which involved alleged assaults were all referred to the CCDOC's Internal Affairs Department (IAD). One hundred per cent of the grievances were responded to, and the JHA found that the answers provided were responsive to the allegations, suggesting that a full and meaningful review had been performed. However, the JHA pointed out that the quickest response with respect to a complaint involving alleged assault was 27 days and the average response time was more than 50 days.

It is the position of the Sheriff that allegations involving alleged assault are extremely serious allegations which cannot be dealt with in a five-day period as provided in the Decree. Allegations of assault by a staff member require an IAD investigation. The investigation requires assignment of investigators, locating and interviewing all witnesses and analysis of the information collected. Frankly, it is inconceivable that such an investigation would take less than five days, much less, be completed and resolved within that time period. The JHA '05 Report, at page 108, lists 15 different categories of grievance. Certainly, most of the categories can be dealt with

within the five-day limitation. However, incidents with staff members which may result in job action and discipline should be separated from the remaining categories. Also, incidents with another inmate which may require interviews of several witnesses should also be separated out from other grievances. The Sheriff requests that a modification be discussed with respect to the time allotted for responses to grievances involving verbal and non-verbal incidents with staff or other inmates.

The most common complaint among inmates was with respect to medical grievances over which the Sheriff has no control. As the JHA '05 Report aptly points out, grievances are opened and logged in by CRW's who then sort the grievances, obtain a control number and hand-deliver the grievances to the department or agency involved. Grievances delivered to the Cermak Health Services are dealt with by that entity and not by the CCDOC.

It should be further noted that the shortage of CRW's, which has previously been discussed in the staffing section of this report, may contribute to the length of time required to handle a grievance. Furthermore, there is no electronic transference of the grievance information from the CRW's to the jail divisions or to other departments or affiliated agencies. They are collected by hand, sorted by hand, given a control number by hand and then walked to the appropriate part of the sprawling jail complex to which the grievance must be delivered. An increase in the number of CRW's dealing with grievances and the acquisition of computers and a computer network to monitor the

grievances, direct the grievances and the responses, would certainly aid in reducing the amount of time necessary to process and respond.

J. **DISCIPLINARY PROCEDURES**

The CCDOC has prepared a completely new videotape which explains in detail the disciplinary rules and procedures, along with information about jail programs which is shown to inmates on a regular basis. Furthermore, inmate rules and regulations are posted in living units in all divisions, as well as the Division V receiving room and in the law libraries.

As set forth in the JHA Report, there has been a significant improvement in the dismissal rate of disciplinary cases. The JHA '05 Report recognizes that significant progress has been made by CCDOC staff in reducing the number of disciplinary case dismissals due to inability to comply with the provisions of the Duran Decree. JHA further noted that there were very few situations in which inmates had been held in segregation, in violation of the Consent Decree.

K. **INMATE AND STAFF INJURIES**

The CCDOC takes seriously its obligation to insure both the safety and security of the correctional staff and any inmate who is remanded to its custody. The JHA '05 Report indicates that the rate of injuries per 1000 inmates is 4% lower than the period covered in the JHA '04 Report. Importantly, the 39-month trend data from January of '02 through March of '05 shows a slight downward trend in the rate of both staff and inmate injuries. JHA commends the CCDOC staff and officials at page 125 of its report

30

for the low rate of staff and inmate injuries over time, especially in light of the overcrowded jail and the understaffing of correctional officers.

As was reported last year, both Special Incarceration (SI) units have been relocated from Division IX to Division I. More difficult inmates were assigned to Unit SI-2 and more compliant inmates were housed in Unit SI-1. Correctional officers from the S.O.R.T unit staff SI-2. S.O.R.T. officers no longer staff SI-1 as it is staffed with Division I regular CO's. The relocation of the Special Incarceration Units has improved the CCDOC's ability to manage high profile and high-risk inmates.

Although there is nothing in the JHA'05 report about the recent case of *Fields, et al. v. The Sheriff, et al.* tried in the Circuit Court of Cook County, Sheriff Sheahan believes it is appropriate to comment on that case at this time.

The *Fields* case was brought by three convicted and one accused murderer alleging assault and battery by correctional officers at the County jail. The case cost the County of Cook and taxpayers literally millions of dollars in defense costs, personnel costs and other related costs in defending a frivolous complaint resulting from an event which was produced and directed by the plaintiffs themselves in an attempt to extort damages from the County.

Suffice it to say that a jury of twelve citizens took only twenty minutes to reject the plaintiffs' fraudulent claims after three weeks of trial; a trial in which the plaintiffs' own medical expert testified under oath that any injuries complained of did not correlate with the plaintiffs' version of events.

31

In order to avoid such claims in the future, the Sheriff has requested an appropriation for the installation of hardwired video cameras in all divisions of the County jail so that allegations of assault by staff members may be readily investigated. The request for such video equipment has been rejected by the County Board as too costly. In the meantime, the Sheriff has acquired less expensive handheld video cameras for each division of the County jail and for the Special Operations Response Team (S.O.R.T.). The handheld video cameras are used to videotape areas of the jail and to videotape situations where S.O.R.T. is called in for extractions or to quell disturbances. The Sheriff is completely confident that the taping of jail operations will demonstrate the professionalism of the CCDOC staff and provide a ready test for the veracity of inmate allegations.

## L.  PROTECTIVE CUSTODY

Protective custody is provided to any detainee who requests it. A requesting detainee will be transferred to the protective custody unit where the CCDOC is committed to providing the highest degree of protection to those inmates. Due to the fact that some inmates have requested transfer to protective custody so that they could actually have contact with, and possibly harm, other protective custody detainees, the CCDOC has instituted a procedure wherein detainees housed in the protective custody unit, are kept in their cells for approximately 23 hours each day. The purpose of the procedure is to provide the utmost protection and to keep inmates who may have a reason or desire to hurt another inmate from being able to do so. Any claim of fear for

personal safety voiced by an inmate is taken seriously and protective custody is provided. The procedures initiated and employed by the CCDOC are constitutional, compliant with the Duran Decree and are reasonable and necessary to protect at-risk detainees who have requested protective custody.

**CONCLUSION**

Sheriff Michael F. Sheahan and his staff have consistently and constantly attempted to devise and implement programs to reduce overcrowding and to improve conditions in the Cook County jail in compliance with the Duran Decree. With the expansion of the DWJS program, the SEMU program and the Pre-Release Center, it is possible that in the foreseeable future there may no longer be an overflow problem at the County jail. However, barring expansion of the jail facilities, a spike in arrests and indictments could change that optimistic forecast.

The increase in staffing provided by the County Board in its latest budget is a welcome, but by no means complete, solution to the problem of staffing. The issue of a training budget for CCDOC personnel must be addressed in order to provide an efficient and professional staff. The cutback on funding for Cermak Health Services which provides healthcare screening and treatment is a matter of great concern which must be addressed as soon as possible. A consistent effort should be made to reduce the length of stay by inmates in the county jail. A decrease in the length of stay would significantly aid in reducing jail population. Additional funds are needed for staffing both the State's Attorney and Public Defender's offices in order to resolve more cases.

In order for the criminal justice system to work in an efficient and constitutional manner, all of the component parts of the system must be funded and staffed appropriately.

It is the obligation of the Sheriff to ensure the safety and security of the citizens of Cook County, the correctional staff, and any person who is remanded to his custody. It is the mission of the Sheriff to offer programs designed to motivate detainees and provide self-improvement opportunities to assist them in becoming more productive members of society and to provide a secure and professionally operated corrections facility with a highly qualified, well-trained and dedicated staff. The Sheriff of Cook County has consistently demonstrated a commitment to both the obligation and the mission and will continue to do so.

Respectfully submitted,

Michael F. Sheahan,
Sheriff of Cook County


By:

Daniel F. Gallagher,
Querrey & Harrow, Ltd.


Querrey & Harrow, Ltd.
175 West Jackson, Suite 1600
Chicago, IL 60604
I.D. #90663
(312) 540-7000

34