

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| DAN DURAN, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 74 C 2949 |
| | ) | |
| MICHAEL F. SHEAHAN, Sheriff of | ) | The Hon George M. Marovich |
| Cook County, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**FILED**

AUG - 1 2005
AUG 1 2005
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## NOTICE OF FILING

**TO:** (See attached Service List)

**PLEASE TAKE NOTICE** that on Monday, August 1, 2005, we filed with the Clerk of the Northern District Court of Illinois, Eastern Division, *Plaintiff's Memorandum Regarding the Court Monitor's May 13, 2005 Report,* a copy of which is attached and served upon you.

_____
Locke E. Bowman

Locke E. Bowman
MacArthur Justice Center
University of Chicago Law School
1111 E. 60th Street
Chicago, IL 60637
(773) 753-4405

## "SERVICE LIST"
Duran v. Sheahan, et. al.; No. 74 C 2949

Donald J. Pechous
Patrick T. Driscoll, Jr.
Cook County State's Attorney's Office
500 Richard J. Daley Center
Chicago, Illinois 60602
(312) 603-5440
(312) 603-3000 (Fax)

Charles Fasano
John Howard
John Howard Association
300 W. Adams Street, Suite 617
Chicago, Illinois 60606-5101
(312) 782-1901
(312) 782-1902 (Fax)

Daniel F. Gallagher
Querrey & Harrow
175 W. Jackson Boulevard, Suite 1600
Chicago, Illinois 60604-2827
(312) 540-7674
(312) 540-0578 (Fax)

Paul A. O'Grady
Chief of Operations
Cook County Sheriff's Office
Richard J. Daley Center, Suite 704
Chicago, Illinois 60602
(312) 603-3396
(312) 603-3305 (Fax)

Robert E. Lehrer
Diane Redleaf
Lehrer & Redleaf
36 S. Wabash Avenue, Suite 600
Chicago, Illinois 60603
(312) 332-2121
(312) 332-1717 (Fax)

*AE*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

*FILED*

*AUG - 1 2005*
*MICHAEL W. DOBBINS*
*CLERK, U.S. DISTRICT COURT*

| | | |
|---|---|---|
| DAN DURAN, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 74 C 2949 |
| | ) | |
| MICHAEL F. SHEAHAN, Sheriff of | ) | The Hon George M. Marovich |
| Cook County, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' MEMORANDUM REGARDING**
**THE COURT MONITOR'S MAY 13, 2005 REPORT**

Counsel for the plaintiff class have reviewed the John Howard Association's May 13,

2005 Court Monitoring Report, "Crowding and Conditions of Confinement at the Cook County

Department of Corrections and Compliance With the Consent Decree" (the "Monitor's Report"

or the "Report"), as supplemented, most recently, with a July 12, 2005 update of population and

capacity at the Cook County Jail (showing Jail capacity and population data through June 30,

2005). Plaintiffs' counsel also received and reviewed two letters from the Monitor to Cook

County Board President John Stroger, the first dated April 20, 2005 and the second dated July

11, 2005 (hereinafter, respectively, the "April 20 letter" and the "July 11 letter," Ex. A and B

hereto). Both letters concern the continued staffing and overcrowding problems at the Jail.

Finally, we have also received and have reviewed status reports, addressing the matters presented

in the Monitor's Report, from the defendant members of the Cook County Board and, separately,

from the Sheriff of Cook County.

Plaintiffs commend the Monitor for his thorough and thoughtful analysis of the current

situation in the County Jail. The Monitor's Report documents a significant, recent downturn in

population at the Jail. Nonetheless, the Jail continues to face a serious problem of overcrowding and understaffing. In June 2005, the daily average overflow population stood at 706, meaning that, in the words of the Monitor, "the number of inmates sleeping on the floor [in the Jail] remains at unacceptable levels." Report at 22. The plaintiffs' response focuses on several specific issues as to which we see both a critical need and an opportunity for improvements to address matters connected to this core problem.

With the Monitor (*see* Report at 54), the plaintiffs believe that the current population downturn provides an opportunity for the defendants to make significant strides toward compliance with this Court's April 9, 1983 Decree. With that goal in mind, the plaintiffs propose below specific recommendations for action in four areas. *First,* the defendants must take steps now to anticipate that additional hiring will almost certainly have to occur in FY 2006 and thereafter in order to achieve acceptable staffing levels. *Second,* the defendants, with the Court's supervision, should propose a concrete plan to eliminate the overcrowding that plagues Division IV, the division that houses women in general population. *Third,* the Monitor has raised serious concerns about the crowding and physical conditions in the temporary RU Building and in the Jail's receiving room. The defendants should conduct a feasibility study for a new building to house both the special needs male population (currently housed in the RU Building) as well as both the male and the female receiving function. *Fourth,* the Monitor's Report describes an analysis of a randomly selected sample of inmate grievances, which revealed a significant number of complaints regarding physical injuries inflicted by staff. Plaintiffs recommend that the defendants provide the court with a specific proposal to address the documented problems of delay in responding to such grievances.

2

Our recommendations are detailed in the following four subsections of this Memorandum. Following the recommendations for each of the four areas, plaintiffs explain the reasons for their proposals.

## I. The Defendants Must Take Immediate Steps to Anticipate the Reality that Additional Hiring Will be Required in FY 2006 and Thereafter.

### Plaintiffs' Recommendations.

1. This Court should direct the County defendants to *immediately* convene a meeting of the County Board's Law Enforcement and Corrections Committee and of the Cook County Department of Corrections Subcommittee, to discuss the understaffing problem at the Jail and to begin to develop a *long range* stage solution to that problem, as the Monitor suggests, *i.e.,* one covering not only FY 2006 but subsequent years. *See* April 20 letter at 1, 3; July 11 letter at 3; *see also* Sheriff's Report at 22 (endorsing this suggestion). The Committees should be directed to consider, among other things, the provision of a training budget for COs *See* Sheriff's Response at 20-21. The Court should also direct the Committees to request Michael Mahoney, who is directing the MGT of America study of staffing at the Jail (*see* Monitor's Report at 93) to provide a provisional estimate of the minimum number of additional COs required to achieve full compliance with the requirements of the Decree. The Committees should be directed to employ this provisional estimate for planning purposes, at least for FY 2006.[1]

---

[1] The Monitor's Report notes that the term of MGT's contract runs from April 15, 2005 through August 14, 2005, mid-August being shortly before the annual budget cycle for Cook County begins. Monitor's Report at 83. But the Monitor informs plaintiffs' counsel that MGT is unlikely to submit its report to the Board until November 2005, shortly before the FY 2006 budget year begins, or perhaps even later. This is substantially later than the parties and the court anticipated when the court itself first raised, in the fall of 2004, the subject of a study that Mr. Mahoney would direct. If the November 2005 or later date is the realistic one, the MGT report will come too late for the County meaningfully to utilize it in connection with FY 2006 staffing planning and budgeting. Any such result will thereby be precisely the one that both the Monitor and the court itself sought to avoid when it urged the County defendants, in the winter and spring of 2005, to get an early start on and expedite its planning process. There may be nothing that can be done to expedite completion of the final MGT report at this stage. But that does not mean that the parties and the Monitor may not capitalize on some of the work that Mr. Mahoney and his charges have already undertaken. Asking Mr. Mahoney for a provisional estimate is a modest request, and there is a huge margin of error, so far as meaningful planning for FY 2006 is concerned. Thus, if any of the staffing estimates either the Monitor or

2.      This Court should direct the County defendants to promptly involve the Monitor

and plaintiffs' counsel in discussions with some or all of the County Board Committee members

in order to inform the Monitor and plaintiffs' counsel of the results of the Committees'

deliberations (including what budgeting recommendations they will make to President Stroger)

and to solicit their ideas regarding the understaffing problem, including the provision of a

training budget.

3.      The Court should direct the County defendants to ensure that the Committees or

Committee members who have been convened pursuant to recommendation 1 and have carried

on the consultations pursuant to recommendation 2 make Jail staffing budgeting

recommendations to President Stroger, at least for FY 2006, by September 15, 2005, *after*, but

toward the beginning of the FY 2006 budgeting planning cycle. The staffing recommendations

must include a recommendation respecting the Sheriff's training budget for COs. *See* Sheriff's

Response at 20-21.

**Reasons for the Plaintiffs' Recommendations**

The Monitor accurately describes the staffing progress that has been made at the Jail

owing to the intervention of this Court. Monitor's Report at 75-77. That intervention resulted in

the Board funding 283 new total CO positions for FY 2005, though, as the Monitor points out

(*id.* at 75 n. 11) the "actual number of FTE CO positions funded was considerably less than 283,

insofar as many of these positions were funded for, e.g., three, six and one months, in accordance

with the capacity to train a finite number of cadets at any one time[.]" *Id.* at 75 n. 11. The result

---

the Jail administrators proffered last fall and winter, were even remotely accurate, and the court adheres to the
incremental approach that it has favored, then a provisional estimate by Mr. Mahoney is apt to be substantially
higher than the County will be able to reasonably budget for FY 2006 in any event. The County defendants may
therefore reasonably proceed with FY 2006 budgeting for CO staffing at the Jail, by taking a percentage (*e.g.*, one
third) of the provisional estimate of the total number of COs needed, with some reasonable assurance that the final
recommendation, based on the final MGT report, will not be that far off from the provisional percentage total.

4

of the Court's intervention, in any event, is that during this calendar year, there has been the "first change in the number of CO positions in the CCDOC budget since December 1, 1999." *Id.* at 77 and Table 1.11.

But incremental, if commendable, progress on the understaffing problem at the Jail during this calendar year, hardly resolves that problem. When this case was before the court in the several conferences and hearings that preceded and followed plaintiffs' Contempt Motion last fall and winter, neither the court nor the Monitor, nor any of the parties (including even the County defendants) seriously advanced the view that the Jail was remotely fully staffed in a manner that would meet the requirements of the Decree. Nor did anyone suggest that the hiring of 283 FTE CO positions (a hiring level that has not, in any event, been achieved) would meet those requirements.

As the parties discussed with this Court last winter, the staffing level at the Jail has been egregiously low for many years. The current staff to inmate ratio is reportedly one to eleven. The problem of understaffing has been exacerbated as a result of the steady climb in the inmate population even as the County has failed to increase staff. Thus, as plaintiffs noted last year, 413 staff (not 283) would have to be added *even to maintain the presumptively inadequate staff to population ratio that prevailed in 1996. See* Plaintiffs' Response to Defendants' Status Report (filed August 23, 2004) at § II.

According to the Monitor's own informed estimate regarding the staffing situation, a total of 750 new COs (not 283) would have to be added to the Jail staff in order to achieve minimal compliance with the Decree. *See* Plaintiffs' Contempt Motion at ¶ 7 and n. 8. The Sheriff's view was that the number of additional staff needed was higher – according to the Jail

Administrator's own internal review, 1086 additional COs were necessary to ensure compliance with the Decree.

In the context of the contempt proceedings last year, no defendant, including the County defendants, contended that the number of additional needed COs was any lower than the 750 calculated by the Monitor. The County Defendants appear now to have hardened their position. While the defendants have not forthrightly stated their opposition to increasing staffing at the Jail, they have erected contentions that may foreshadow such opposition. At best for the Board, it is engaging in wholly unwarranted delay in reckoning with the staffing issue, the resolution of which, among the parties, is principally in their hands.

For starters, as explained, the relevant Board Committees have, seemingly cavalierly, disregarded this Court's and the Monitor's urgings to give prompt and considered attention to the staffing problem well in advance of the beginning of the FY 2006 budget year. The Monitor's April 20 and July 11 letters to President Stroger concerned principally the continued staffing and overcrowding problems at the Jail.[2] The April 20 letter specifically sought the President's active "participation in addressing the[ ] [staffing and overcrowding] issues in a timely and proactive fashion," and urged him to "schedule meetings of the Law Enforcement and Corrections Committee and/or the Cook County Department of Corrections Committee, or both, in the next several months, to develop an agenda of current interest and begin the process of evaluating the possible solutions."

The July 11 letter expressed dismay that no such Committee meetings had taken place, and, "with greater urgency than before," again sought to "schedule [such] meetings at the earliest

---

[2] The court and the Sheriff, among many others, such as Chief Judge Biebel, were, of course, afforded copies of both letters.

possible opportunity to develop an agenda of current issues and begin the process of evaluating possible solutions." The July 11 letter also expressed dismay that "delays have affected several projects that are critical to resolving the overcrowding and staffing problems at the Jail" and observed that "these delays only serve to inhibit the kind of thoughtful and *timely* consideration that such complex and costly matters truly deserve." To the knowledge of plaintiffs' counsel, neither the County Defendants nor their counsel have ever responded to the Monitor's April 20 or July 12 letters, or, indeed, acknowledged their receipt.

Significantly, the Monitor's urgings tracked the Court's own at the various in chambers conferences and court hearings it conducted regarding the staffing and overcrowding problems at the Jail. In those conferences and hearings, this Court consistently pressed three points:

*First,* to remedy the overcrowding and staffing problems, the Court was surely willing to "work with . . . [defendants] incrementally" (11/15/04 Tr. at 21); it sought no immediate global budget busting solution to either problem.

*Second,* the court was "unwilling to allow this thing [understaffing and overcrowding] to go on while people are studying something to death." *Id.* at 23. The Court emphasized: "I will deal with it incrementally. And I don't know when this budget session ends, but I told you before what is intolerable is, well, we're going to do it judge, but it's too late for this budget year." *Ibid.*

*Third,* the Court expected counsel for the parties and the Monitor to work together cooperatively in the coming months to avoid a repetition of the unhappy events that gave rise to the litigation here between November, 2004 to March 2005, which involved plaintiffs filing their Contempt Motion, presented November 24, 2004, to secure defendants' compliance with those

7

provisions of the Decree that required a certain level of staffing at the Jail.[3] That litigation had its roots, in part, in the failure of the County defendants to consult with either the Monitor or plaintiffs counsel regarding the understaffing and overcrowding problems. 11/15/14 Tr. at 21 (Court: "I expect[ed] that today I would have something that you people had sat down and discussed. I am greatly dismayed, greatly dismayed, that none of these conversations have involved the plaintiff[s] in this case and the Court's monitor. I find that to be inexplicable and . . .unacceptable"). It also had its roots in the failure of the County defendants and the Sheriff to meet about the staffing problems at the Jail until November 14, just a little more than two weeks before the beginning of FY 2005–hardly enough time to give considered deliberation to what the Monitor later referred to (in his July 20 letter) as a "complex and costly matter[ ]."

In sum, both this Court and the Monitor have consistently expressed the view that the understaffing and overcrowding problems are complex ones that will require the concerted and cooperative efforts of all the parties and the Monitor to address -- meaning, among other things, that these are not problems that can be resolved precipitously, within a few weeks before the relevant fiscal year begins. Consistently, in its Report, the Board implies that it must receive Mr. Mahoney's MGT staffing report before it undertakes any meaningful discussion of the staffing problem at all. *See* Board Report at 11. But this report may not be completed until November or even later. This is far too late in the day to undertake the serious staffing planning discussions this Court and the Monitor have urged.

More significantly, the Board misstates the staffing requirements of the Decree, strongly implying that the Decree Order "specifies staffing levels based [entirely] on living units, and

---

[3] Plaintiffs' counsel, to conserve expense, did not order a transcript of the January 12 hearing herein. But, to their recollection, this is a fair statement of the import of some of the court's observations at that hearing.

generally requires one officer per living unit." *See* Board Report at 11. This, the Board says, "is the relevant inquiry, an inquiry that has been lost in the discussion." *Id.*

To the contrary, what the Board loses sight of is the language of the Decree itself, which makes relevant not only the number of living units, but also provides (Decree at ¶ 3D) that "Sufficient staffing shall be provided to permit implementation of *all* sections of the Order (emphasis added). As the Monitor has, on many occasions, explained to the County Board defendants themselves, and as the MGT staffing report will doubtlessly attest, this puts the minimal staffing levels required by the Decree *far above* what they would be if they were grounded solely on the number of living units. However many COs must be assigned under the Decree to cover the living units, a substantial number of additional COs is required to ensure, for example, that pre-trail detainees are timely transported to and from court or to meet with their lawyers, or to medical appointments, and to and from the law library.

For the County defendants, at this stage of the litigation, to ignore this fact is a transparent attempt to erect an anticipatory, if manifestly erroneous, defense against an MGT report finding that additional COs (beyond last year's new COs) must be hired to meet the staffing crisis at the Jail. *See* Board Report at 11-12 ("it is . . . possible that the County defendants have already budgeted for a sufficient number of correctional officers to comply with the Decree.").

Finally, the Board's Response ignores completely the training budget issue, which the Sheriff reviews at some length in his response. Sheriff's Report at 20-21. This issue was a prominent one in the litigation, last fall and winter, preceding and following plaintiffs' Contempt Motion. It is not credible that the Board inadvertently overlooked the issue, which is critical; it chose to overlook it, much as it has chosen to overlook the need for staffing discussions and

9

planning well in advance of the FY 2006 budget year. But ignoring the training budget issue does not make the issue go away, much less remedy the resulting shortfalls in having COs "on the job" if the training budget is not fully restored. Plaintiffs concur with the Sheriff's position that it is "imperative that a training budget be restored for the Office of the Sheriff." Sheriff's Response at 21.

This Court should direct the relevant committees of the County Board to begin consideration of the staffing needs at the Jail and to address the budgeting for this need, as plaintiffs recommend. It would obviously facilitate this consideration of Mr. Mahoney could provide the County Board committees with a preview of his likely findings. But, based on the currently available, informed estimates, it is a virtual certainty that additional hires will be necessary. This issue must get on the County Board's radar screen *before* the latter stages of the County's budget cycle, in order to avoid the brinksmanship and contention that ensued last year.

## II.     The Sheriff Should Propose a Plan to Eliminate Overpopulation in Division IV.

## Plaintiffs' Recommendations.

1.     The Sheriff should propose a specific, achievable plan to eliminate overcrowding in Division IV of the Jail, an area of chronic overcrowding, in which, nonetheless, there is reason to believe that, with addition of new staff and expansion of existing release programs, the overcrowding could be eliminated.

2.     To the extent the Sheriff's plan may involve the hiring of additional staff to expand any of the existing release programs, the Sheriff's plan should be forwarded to the County Board's Law Enforcement and Corrections Committee and to the Cook County Department of Corrections Subcommittee, so that those committees may incorporate the

Sheriff's plan into their consideration of the need for additional Jail staffing during the coming fiscal year.

3.       To the extent the Sheriff's plan may involve the construction of a new facility to house an expanded Sheriff's Female Furlough Program, the County Board's Law Enforcement and Corrections Committee and the Cook County Department of Corrections Subcommittee should give immediate and urgent consideration to this need.

**Reasons for the Plaintiffs' Recommendation**

The Monitor's Report notes that female inmates housed in Division IV experienced increased levels of crowding at various points within the time period covered in the Report. Report at 86-87. The Sheriff makes note of the fact that the length of stay[4] for female inmates increased significantly during the current period, in marked contrast to the slight downward trend for males. Sheriff's Report at 4. The number of female inmates in the Jail is increasing, also in contrast to the trend for males.

Plaintiffs agree with the Monitor's judgment that these trends indicate the increased importance of focusing on how to cope with this particular population. Report at 86. The Monitor reports that, at times during the present reporting period, 100 to 125 female inmates were forced to sleep on mattresses on the floor. *Ibid.* When counsel for all parties recently toured Division IV of the Jail, the Monitor advised us that the number of inmates on the floor in that Division at that time was likely about 60.[5]

---

[4] The Board is inappropriately critical of the Monitor's calculation of length of stay averages in his Report. *See* Board Report at 12-14. To the contrary, the Monitor's calculations are entirely transparent and are appropriate. Whether a "snapshot" approach is used or whether the average length of stay is calculated based on release data, the bottom line is undeniable: too many inmates remain far too long in the County Jail. Lengthy stays are particularly troubling when they are served by individuals whose cases are dismissed or who are found not guilty. *See* Monitor's Report, Table 1.5.

[5] It is impossible to determine how many inmates are sleeping on the floor by simple comparison of the total beds in the division with the population count for that division. For example, the security characteristics of the Division

Plaintiffs recognize that the unpredictability of Jail admissions on any particular day makes it difficult to eliminate all overcrowding on all wings of Division IV. But we are confident that forward strides could be made if the Sheriff's successful Electronic Monitoring Program and the Sheriff's Female Furlough Program were expanded. The Monitor has informed us that, with the addition of just a few more staff, dozens of inmates could be added to the EMP caseload. To the extent expansion of the SFFP must entail the construction of a new facility, plaintiffs concur in the Monitor's recommendation that "Cook County officials give this proposal their most serious and timely consideration." Report at 32.

Intuitively, it would appear that the Division IV female population poses a relatively small security risk and that, therefore, appropriate candidates for EMP and the SFFP could be found among the population that is currently being incarcerated in Division IV. Plaintiffs believe focused consideration of this issue is imperative.

**III.   Cook County Officials Must Give Immediate Consideration to the Construction of a New Facility to Replace the Temporary RU Building and to House the Receiving Function.**

### Plaintiffs' Recommendation

Cook County officials must give immediate and urgent consideration to the construction of a new facility within the Jail campus that will serve three purposes: (1) an expanded 1000 bed facility for male inmates with special needs; (2) a receiving facility for male inmates; and (3) a separate receiving facility for female inmates.

### Reasons for Plaintiffs' Recommendation

The Monitor's Report notes that the current facility for male inmates with special needs, the so-called RU Building, is plagued by problems and has outlasted its projected useful life by a

population on any particular day may require the Jail to leave beds empty in medium security wings, even as inmates are sleeping on the floor in minimum security wings, since medium and minimum security inmates cannot be mixed together on the same wing.

number of years. The ceilings, the HVAC system, plumbing and light fixtures all require massive renovation and the Monitor has concluded that the very large costs associated with these projects would not be justified, given the building's temporary nature and inadequate size. *See* Monitor's Report at 57. The building was designed to last for 5 to 7 years and has already been in use for twenty years. *Id.* at 63.

When attorneys for all parties and the Monitor recently toured the RU Building, problems with the HVAC system and the ceiling were immediately apparent. Compounding these repair needs, is the fundamental difficulty that the RU Building does not have sufficient bed space to accommodate all of the male inmates who suffer from mental or physical illness and who should be housed in a facility where appropriate treatment can be provided and where they can be given such additional protection as may be warranted because of their particular vulnerabilities. At the present time, the Jail has fewer than 400 beds available in the RU Building for male inmates with psychiatric needs. The Monitor has informed us that some 600 additional inmates receiving psychiatric medications are housed in dedicated wings within the Jail's general population.

The Jail's Receiving Room, located in the basement of Division V, is "organized chaos," in the words of Jail personnel during the attorneys' recent tour of that area. The receiving area is cramped and, yet, must process over 100,000 inmates into the Jail each year. The bullpens where inmates await processing are not equipped with toilets. Space considerations do not permit adequate separation between male and female inmates who are being processed. The traffic flow as inmates move through various screening sites is, indeed, best described as chaotic.

This crowded and chaotic environment certainly heightens the risk of injury to staff and inmates. Because of problems with the physical space, additional staff are required in the receiving area – in order to perform functions such as escorting inmates from the bullpens to the

13

toilet. Plainly, the receiving function in the Jail needs to be relocated to an environment that is substantially larger and has been designed specifically to serve that function.

Plaintiffs believe that the sensible way to address these two urgent needs – for adequate housing for male inmates with special needs and for an appropriately sized and designed receiving area – would be to construct a new facility that would house both. The defendant County Board members should begin immediate planning for construction of this facility. In plaintiffs' view, further refusals on the part of the County Board to address these very serious construction needs would amount to dereliction of the Board's responsibilities under the Decree.

III.    **The Sheriff Should Propose a Plan for Eliminating Extensive Delays in Responding to Serious Inmate Allegations of Physical Injury by Staff.**

**Plaintiffs' Recommendations**

1.      The Sheriff should develop a proposal for addressing the documented, protracted delays in responding to inmate grievances concerning alleged staff on inmate and inmate on inmate assaults.

2.      To the extent the Sheriff's proposal includes the hiring of additional Correctional Rehabilitation Workers or Internal Affairs Division staff, the proposal should be forwarded to the County Board's Law Enforcement and Corrections Committee and the Cook County Department of Corrections Subcommittee, which should incorporate consideration of this proposal into their review of staffing needs for FY 2006 and thereafter.

**Reasons for Plaintiffs' Recommendations**

The Monitor's Report describes the Monitor's review of the handling of a sample of grievances recently filed by Jail inmates. Plaintiffs were concerned to learn that the average time for responding to grievances has lengthened since the last such study and that Jail administrators are seriously out of compliance with the five day time limitation set forth in the Decree for

14

responding to grievances. Of particular note is the very lengthy response times – between 27 and 70 days – that the Monitor found it took for Jail administrators to respond to serious allegations of staff on inmate or inmate on inmate assault. *See* Monitor's Report at 111-12.

It may be, as the Sheriff contends (Sheriff's Report at 28-29), that five days is an unrealistic time period within which to expect a written response to an inmate grievance that contains serious allegations of physical violence. But it is very clear that 27 days or longer for such a response is far too long. The Sheriff must undertake an investigation of why the response times for serious grievances are so lengthy and must make a proposal to correct this problem. The Monitor identifies insufficient staff as one possible reason for these delays. To the extent the Sheriff's investigation concludes that additional Correctional Rehabilitation Workers and/or Internal Affairs Division investigators must be hired to resolve this problem, the Sheriff should communicate this need immediately to the relevant committees of the County Board, so that the Board can incorporate this need into its consideration of future staffing needs at the Jail.

The Sheriff believes there should be a modification of the Decree to extend the response period for serious grievances involving allegations of physical violence perpetrated by staff or inmates. *See id.* Plaintiffs believe that this Court's consideration of any such modification should come in the context of a detailed study of why extra time is necessary and, more particularly, *how much* additional time would be required to effectively address serious inmate complaints, while at the same time ensuring that the inmates receive prompt and meaningful responses to their grievances.

## CONCLUSION

The Court should adopt plaintiffs' recommendations set forth above, by way of an order directed to defendants.

Respectfully submitted,

**DAN DURAN, individually and on behalf of a class of similarly situated persons**

By: _____
One of their attorneys

Robert E. Lehrer
Diane L. Redleaf
Lehrer & Redleaf
36 S. Wabash Avenue, Suite 600
Chicago, IL 60603
312/332-2121

Locke E. Bowman
MacArthur Justice Center
University of Chicago Law School
1111 E. 60th Street
Chicago, IL 60637
773/753-4405

Attorneys for Plaintiffs

16

# Exhibit A



ESTABLISHED IN 1901

OVER 100 YEARS OF
CORRECTIONS REFORM

## JOHN HOWARD ASSOCIATION/FOR PRISON REFORM

300 WEST ADAMS STREET • SUITE 617 • CHICAGO, ILLINOIS 60606 • TEL. (312) 782-1901 • FAX. (312) 782-1902
www.john-howard.org

April 20, 2005

The Honorable John H. Stroger, Jr.
President
Cook County Board of Commissioners
118 North Clark Street, Room 567
Chicago, IL 60602

re: **Duran v. Sheahan et al.**

Dear President Stroger:

I am writing to inform you about several issues relating to the Cook County Department of Corrections (CCDOC) and other segments of the justice system in Cook County as they relate to the **Duran** case and to solicit your participation in addressing these issues in a timely and proactive fashion.

As you know, your decision to fund 283 Correctional Officer positions in the FY 2005 Cook County budget eliminated the current basis for the contempt hearing that had been scheduled for March 9 - 10, 2005. More importantly, the hiring of these Officers provides much-needed relief for an overcrowded jail that has been seriously understaffed for many years. We have been informed that, earlier this month, you approved funding for a full staffing study of CCDOC, which will hopefully provide all concerned parties with reliable figures for the number of CO's needed to comply with the provisions of the Consent Decree. While the results of this study, which will not be available for several months, are likely to be crucial to future budget requests and your deliberations thereon, we are convinced that it would be very unwise to await the issuance of this study before resuming a rational discussion of the issues facing CCDOC and other portions of the justice system of Cook County. This letter is intended to solicit your collaboration in this process as soon as possible.

To give you an appreciation of the reasons for this request, I would like to provide you with a brief overview of some of the more pertinent issues presently facing CCDOC. As you will note from the enclosed monthly update, the level of crowding at the jail has decreased during the past several months but has not been eliminated. Whether the current trend is likely to continue cannot be predicted with any degree of certainty with the data available to us, and we may just as easily experience a resurgence of crowding as we did in 2004 (see update). We are hopeful, as I am sure all of you are, that the expansion of both the Electronic Monitoring Program and the Pre-

President John H. Stroger, Jr.
April 20, 2005
Page 2


Release Center, will provide some additional relief from the chronic crowding that has affected CCDOC for more than 15 consecutive years. At the same time, however, we are not convinced that these endeavors will be sufficient to eliminate crowding or remedy many of the other problems affecting the jail.

One of the main reasons for our continued concern relates to the persistence of prolonged lengths of jail stays for many inmates. Based on data from February 2005, the average length of stay for all inmates detained at CCDOC was 188.3 days, which is virtually identical to the average length of stay in July 2004, the last time we analyzed these data. More ominously, average length of stay for female inmates and for male inmates classified as maximum-security both increased between July 2004 and February 2005. Enclosed you will find a table containing length of stay data for your review.

We all await the report from Professor Joseph Trotter and his associates, and we hope that their recommendations regarding a differentiated case management system for the Criminal Division of the Circuit Court of Cook County will prove helpful in expediting the processing of criminal cases. We also believe, however, that any significant improvements in case processing may well involve additional resources for various components of the court system, as well as a commitment to reduce delays in case processing by the private sector of the legal profession in Cook County. We are firmly convinced that your involvement in the analysis and planning for resolving these issues is absolutely essential.

Even if the level of crowding at CCDOC continues to decrease, a number of significant problems affecting the jail are likely to remain unresolved for some time. These will be described in greater detail in our next court monitoring report, which will be submitted in early May, prior to the next **Duran** status hearing, currently scheduled for Wednesday, May 25, 2005, at 1:30 p.m. Some of these problems will require the commitment of additional resources, in both the current fiscal year and in future years.

One of the most significant issues involves the need for a new building to replace the existing Receiving Room and the RU Building, which houses male inmates with medical and psychiatric needs. We have described the multitude of problems affecting both of these units in a long series of JHA court monitoring reports, and we submitted a letter on November 1, 2004 to Michael LaMont, the Director of Capital Planning for Cook County. You should be aware that we were not alone in our support for this project, which was raised by John M. Raba, M.D., Chief Administrative Officer of Cermak Health Services, and by former CCDOC Director Callie Baird. To the best of our knowledge, the Cook County Board of Commissioners took no action on this issue during the recent budget deliberations, and I am not sure that you have been fully apprised of the seriousness of the situation regarding these two critical units. A full and open discussion of this issue is long overdue, and I urge you to keep this issue in mind in the coming months.

President John H. Stroger, Jr.
April 20, 2005
Page 3

During the past few years, several Commissioners have proposed various strategies and methods of increasing the efficiency of different segments of government operations in Cook County. We believe that such proposals should be brought to the table for an unhurried discussion, since it is very likely that substantial additional funds will be required in FY 2006 and succeeding years for jail and court operations. We recognize the fiscal constraints under which Cook County government is operating, and, we believe that serious discussion of these issues at the earliest possible opportunity is absolutely necessary because of these very factors.

Both JHA President James R. "Chip" Coldren, Jr. and I have met with many of you, both individually and during the course of various Cook County Board committee meetings. We urge you to schedule meetings of the Law Enforcement and Corrections Committee and/or the Cook County Department of Corrections Committee, or both, in the next several months, to develop an agenda of current issues and begin the process of evaluating possible solutions. United States Senior District Judge George M. Marovich has expressed a keen interest in the activities of the Cook County Board of Commissioners as they relate to CCDOC and the various issues in the **Duran** case and has instructed us to keep him informed of what progress, if any, is being made on these issues. I strongly suggest we begin the kind of collaborative efforts I have described in this letter at the earliest possible opportunity and, certainly, prior to the status hearing on May 25, 2005.

Mr. Coldren and I would be happy to discuss any of these issues with you at any time and look forward to working with you toward the resolution of these issues and significant improvements at the Cook County Department of Corrections. Please feel free to contact us any time.

Sincerely,

Charles A. Fasano
Director, Prisons and Jails Program

cc:     The Honorable George M. Marovich          Robert E. Lehrer/Diane L. Redleaf
        The Honorable Michael F. Sheahan          Locke E. Bowman
        The Honorable Paul P. Biebel, Jr.         Daniel F. Gallagher
        Patrick J. Driscoll, Jr.                  William R. Quinlan

# Exhibit B



ESTABLISHED IN 1901

OVER 100 YEARS OF
CORRECTIONS REFORM

## JOHN HOWARD ASSOCIATION/FOR PRISON REFORM

300 WEST ADAMS STREET • SUITE 617 • CHICAGO, ILLINOIS 60606 • TEL. (312) 782-1901 • FAX. (312) 782-1902
www.john-howard.org

July 11, 2005

The Honorable John H. Stroger, Jr.
President
Cook County Board of Commissioners
118 North Clark Street, Room 567
Chicago, IL 60602

re: **Duran v. Sheahan et al.**

Dear President Stroger:

In my last letter, dated April 20, 2005, I wrote to inform you of various developments regarding the Cook County Department of Corrections (CCDOC) and other agencies in the justice system in Cook County and to solicit your involvement in discussing these issues in a timely manner. Despite attempts by a few Commissioners to schedule a Committee meeting or to meet with us individually since that time, our efforts to initiate such discussions have been unsuccessful. During this same period, we have learned that delays have affected several projects that are critical to resolving crowding and staffing problems at the jail.

Our primary concerns relate to the slow pace of progress and delays that have impeded the expansion of release mechanisms that are essential to the reduction of crowding at CCDOC; in addition, the staffing study at CCDOC by MGT of America, Inc. is also several months behind the original schedule that was communicated to us and to Judge George M. Marovich. These issues are described in somewhat greater detail below.

Two programs operated by the Cook County Department of Community Supervision and Intervention — the Pre-Release Center and the Electronic Monitoring Program — were scheduled for expansion to permit the release of more inmates and reduce the level of crowding at CCDOC. The expansion of the Pre-Release Center has been delayed by difficulties in obtaining beds and the inability to install central air-conditioning within the budget approved for this project. As of the date of this letter, the beds have not arrived and the upgrade of the electrical system to accommodate window air-conditioning units is only now nearing completion. The expansion of the Electronic Monitoring Program has not occurred for several reasons, including delays in acquiring the additional monitoring equipment needed. The net result is that both of these programs have been unable to expand beyond their current capacity, even though funds for these expansions were included in the FY 2005 budget, which was passed months ago.

President John H. Stroger, Jr.
July 11, 2005
Page 2

The important question of how many additional security staff are needed at CCDOC to achieve compliance with the provisions of the **Duran** Consent Decree can only be addressed upon completion of a staffing study that was approved by the Cook County Board of Commissioners on April 6, 2005. Despite this approval, a contract was not signed until June 2005, resulting in a start date of July 1, 2005 for this four-month project. The projected completion date of October 30, 2005 means that this study will not be available for review until the FY 2006 budget cycle is well underway.

Since the early part of the current fiscal year, the Sheriff's Office has continued its efforts to hire and train approximately 267 new Correctional Officer (CO) cadets, and this process should be completed by the end of September 2005. It is ironic that this complex and prolonged project has proceeded expeditiously, in contrast to the pace of the other projects relating to CCDOC that we have cited above.

In addition to these projects, we all continue to await the report on criminal case processing from Professor Joseph Trotter and his associates. We remain convinced that your involvement, at the earliest possible opportunity, in analyzing and implementing strategies to expedite case processing that will be described in this study in order to reduce length of jail stays will be essential.

We are now midway into the eighth month of the current fiscal year and only a few weeks away from the next **Duran** status hearing, currently scheduled for August 3, 2005. As of this date, three of these important projects remain unfinished and the third has just begun. These delays only serve to inhibit the kind of thoughtful and timely consideration that such complex and costly matters truly deserve.

This afternoon, I reported the status of these issues to Judge Marovich in response to his inquiry about these matters. He instructed me to inform you that he expects all defendants in this case to appear for the next status hearing at 1:30 p.m. on Wednesday, August 3, 2005. I will be in contact with Patrick J. Driscoll, Jr. of the State's Attorney's Office regarding any court order confirming Judge Marovich's statement.

We now repeat our previous request, with greater urgency than before, that the chairpersons of the Law Enforcement and Corrections Committee and/or the Cook County Department of Corrections Committee, or both, schedule meetings at the earliest possible opportunity to develop an agenda of current issues and begin the process of evaluating possible solutions.

Both JHA President James R. "Chip" Coldren, Jr. and I remain available to discuss any of these issues with you at any time and look forward to working with you toward the resolution of these

President John H. Stroger, Jr.
July 11, 2005
Page 3


issues and significant improvements at the Cook County Department of Corrections. Please feel free to contact us any time.

Sincerely,

Charles A. Fasano
Director, Prisons and Jails Program


cc:    The Honorable George M. Marovich        Robert E. Lehrer/Diane L. Redleaf
        The Honorable Michael F. Sheahan         Locke E. Bowman
        The Honorable Paul P. Biebel, Jr.           Daniel F. Gallagher
        Patrick J. Driscoll, Jr.                 William R. Quinlan

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that he served the foregoing document upon all parties listed on the attached service list by facsimile, before the hour of 5:00 p.m. on Monday, August 1, 2005.

_____
Locke E. Bowman