Atty No. 90663

Our File No. 67617-DFG

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DAN DURAN, et al.                      )
                                       )     No. 74 C 2949
                    Plaintiff,         )
                                       )
         v.                            )
                                       )     Honorable Judge Virginia Kendall
THOMAS J. DART, Sheriff of             )
Cook County, et al.                    )
                                       )
                    Defendant.         )

## DEFENDANT, THOMAS J. DART, SHERIFF OF COOK COUNTY'S 2007 STATUS REPORT AND RESPONSE TO JOHN HOWARD ASSOCIATION COURT MONITORING REPORT DATED APRIL 9, 2007

### INTRODUCTION

Thomas J. Dart, the Sheriff of Cook County, ("Sheriff"), by and through his attorneys, Daniel F. Gallagher and Querrey & Harrow, Ltd., presents this status report covering the period from April, 2006 through March, 2007 for the purpose of demonstrating the progress which has been made in terms of achieving compliance with each of the provisions of the Duran Consent Decree and to respond to the status report of the John Howard Association dated April 9, 2007.

The John Howard Association ("JHA") has filed a series of twenty-three (23) reports dealing with inmate population, facility capacity, status of existing and planned jail facilities, assessment of alternatives to incarceration and release mechanisms, and finally the evaluation of compliance with the Duran Decree provisions which relate to the conditions of confinement for detainees.

This report will be Sheriff Dart's first opportunity as the newly elected Sheriff of Cook County to respond to the court monitor's report. This will also be the first time for this Court to review the court monitor's report and the responses of the parties to the litigation.

Although Sheriff Dart assures this Court of the Sheriff's continued cooperation and attempts at compliance, the Sheriff wishes to point out significant problems with respect to continued overcrowding due to the lack of judicial placement of eligible pretrial detainees on electronic monitoring and increasing length of stays for pretrial detainees charged with serious crimes.

The Office of the Sheriff is a constitutional one under the Illinois State Constitution. The Sheriff, however, who is not an employee of the County, and has no power or authority to raise revenues or impose taxes, and therefore is entirely dependent upon the Cook County Board of Commissioners for the appropriation of funds to operate the Office of the Sheriff including the Cook County Jail. Over the years, there have been disagreements between the CCDOC and the Cook County Board of Commissioners relating to providing the funds necessary to implement compliance with the Duran Decree. For years, staffing requests made by the Sheriff were ignored by the Cook County Board of Commissioners until the 2005 Cook County Corporate Budget provided funding for additional correctional officers and security supervisors. Due to the intervention of this Court's predecessor, Judge Marovich, additional staff

2

positions were added to the budget, including additional positions for the fiscal year 2007 budget.

At the present time there are classes scheduled for the training of new correctional officers through the fall of 2007 as will be set forth in more detail in the section of this report dealing with staffing. (See Pg. 26).

Presently, the newly elected County Board of Commissioners has been cooperative in agreeing to fund high priority facilities and planning issues as will be outlined later in the report. (See Pg. 21).

## I.    POPULATION AND CAPACITY

A review of the John Howard Association 2007 Monitoring Report ("JHA '07 Report") shows that the average daily population ("ADP") has remained relatively constant since 2005. Yet, there are months when the population spikes due to various factors beyond the control of the Sheriff including local law enforcement initiatives, and the onset of warm weather (See JHA '07 Report, Table 1.2).

Due to the implementation by the Sheriff of alternative release programs including three non-custodial programs, the Electronic Monitoring Program ("EMP"), the Men's Day Reporting Program ("DRP"), and the Sheriff's Female Furlough Program ("SFFP"), and three custodial/residential programs including the Men's Pre-Release Center ("PRC"), the Women's Justice Services Residential Program and the M.O.M.S. Program, as well as Judge Marovich's previous order (Docketed 11/14/03) permitting the transfer of inmates with unexpired penitentiary terms to the IDOC and

3

management decisions implemented by the executive director of the CCDOC, the overflow population at the County Jail was substantially reduced and for periods of time between January of 2006 and May of 2006 was completely eliminated.

In his 2005 response to the JHA Report, the Sheriff predicted that if the average inmate population stabilized, there could be a dramatic reduction or elimination of the overflow population in 24 to 36 months. By early 2006, that goal was in sight. It came to light, however, that there were potentially serious problems with the electronic monitoring alternative release program which posed a danger to the security of the community. The problem and the suggested solution will be addressed later in Section I (A) dealing with release mechanisms.

Generally, medium security divisions in the jail are intermittently overcrowded while there are vacant beds in other divisions. As pointed out in the past, the reason for continued overcrowding in some divisions is due to the classification of inmates by security levels and other valid correctional factors which result in less than equal distribution within the jail divisions. Since the arrival of various classes of detainees at intake is not within the control of the CCDOC, it is difficult, if not impossible, to predict the populations of the various divisions. Consistently, the CCDOC is extremely careful to avoid overpopulation in divisions where inmates are classified as high security risks.

As the JHA '07 Report points out, Dorm 4 in Division II continues to operate at twice its designed capacity based upon an agreed modification of the Consent Decree permitting the temporary use of double bunks to reduce the amount of overcrowding in

4

that division. CCDOC is well aware of the fact that the additional 300 beds were to be a temporary measure to reduce overcrowding. However, there have been no funds appropriated for renovation projects or for building additional space which would permit the CCDOC to eliminate the additional 300 beds in Division II.

## LENGTH OF STAY

Although the average length of stay in 2007 for all inmates has decreased slightly from the averages during the period of 2002 to 2006, maximum security male inmates have had a significant 9.3% increase in length of stay. (JHA '07 Report Pg. 19.)

Once again, the Sheriff wishes to register his concern at the fact that as of March 30, 2007, 105 inmates have been incarcerated at the County Jail as pretrial detainees for four years or longer. In 2005, 31 pretrial detainees had been incarcerated for more than five years. In 2006, 29 detainees had been incarcerated in the CCDOC for more than five years awaiting trial. As of March 30, 2007, 43 inmates have been incarcerated for more than five years awaiting a trial. The Sheriff advises that he is unaware of any other pretrial detention facility in the State of Illinois where inmates have been incarcerated for more than five years awaiting trial. Sheriff Dart suggests that sustained efforts must be made in attempting to dispose of the cases of those 105 individuals who have been awaiting trial for more than four years.

## A. RELEASE MECHANISMS:

Consistent with past practices, the Sheriff of Cook County and his staff has continued throughout the reporting period to devise, maintain, and implement pretrial

5

release programs, many of which involve linkage to community groups and nongovernmental organizations. The Cook County Department of Community Supervision and Intervention ("DCSI") administers the Sheriff's Electronic Monitoring Program ("EMP"), the Day Reporting Center ("DRC"), and the Pre-Release Center ("PRC"). Each of these programs was created and implemented by the Sheriff for the purpose of providing supervised non-custodial pre-release programs rather than releasing pretrial detainees on what came to be known as the Administrative Furlough Program ("AMF") (f/k/a Sheriff's I-Bond Program).

The pretrial release mechanisms including the Electronic Monitoring Program were created in response to a Memorandum Order entered by Judge Shadur on March 22, 1983 which permitted the Sheriff of Cook County to release individual detainees on I-Bonds at the Sheriff's discretion with virtually no supervision whatsoever. The AMF Program was the most liberal release mechanism ever instituted and did not require any supervision. During the year 1989, 35,000 pretrial detainees, who were for the most part charged with felonies, were released on I-Bonds with virtually no supervision. As might be expected, the rate of detainees failing to appear in Court increased at an alarming rate. In an attempt to stem the tide of the bond forfeitures, the Sheriff at that time initiated an Electronic Monitoring Program to provide some supervision for pretrial detainees being released pursuant to the Memorandum Order of March 22, 1983.

As pointed out in the JHA '07 Report, the use of the AMF I-Bonds has essentially ended and almost no I-Bonds have been issued since 2005. Both the Sheriff of Cook County and the John Howard Association agree that Sheriff issued I-Bonds are inappropriate for use as an alternative release mechanism  The programs which the Sheriff has devised and implemented to reduce overcrowding are more reliable and successful in reducing overcrowding at the jail while maintaining security for the citizens of Cook County.

**THE ELECTRONIC MONITORING PROGRAM**

The Electronic Monitoring Program ("EMP") is operated by the Cook County Department of Supervision and Intervention ("DCSI").   EMP is the largest extra-judicial release mechanism employed by the CCDOC.

Although the EMP is the largest program of its kind in the United States, research shows that it is the only electronic monitoring program which relies solely on the judgment of Sheriff's office personnel and contains no element of judicial placement. Despite the excellent work done by those assigned to operate and supervise EMP, the successful completion rate of participants has ranged from 74% in 1999 to 76.2% in 2006 (JHA '07 Report, Pages 39 and 40).  Even though most EMP participants who did not successfully complete the program failed to do so because of technical program violations, it still means that approximately 1 in 4 of the individuals placed in the program did not successfully complete it.  Although the re-arrest rate has remained very low, the Sheriff believes that there is substantial room for improvement in the

7

successful completion rate by requiring input and recommendations from the bond court judges.

The Sheriff of Cook County lacks the information necessary to make informed decisions as to the eligibility of individuals for EMP. For example, the mittimus received from the Circuit Court of Cook County will indicate only the generic nature of the crime with which the pretrial detainee has been charged. The information provided does not indicate the specifics of the offense or the pretrial detainee's complete history. The Sheriff's Office does not have equal access to the prior history of the individual that the State's Attorney's Office or the Public Defender's Office has and which is communicated to the Court during the bond hearing.

Currently, after a defendant is admitted into the County Jail and after a judge has made a decision setting bond, a computer generates a list of eligible detainees based on selection criteria involving the current charge and bond amount for that detainee. An employee of the Sheriff's Office reviews the list and compares it to histories relating to bond forfeiture warrants, violent crimes, or excessive arrest records.

This method of selection leaves substantial room for improvement and cries out for required input and recommendations from the bond court judges.

Under Illinois law, each county circuit court is required to establish a pretrial service agency to provide the court background data regarding the pretrial release of persons charged with felonies and to permit effective supervision of compliance with the terms and conditions imposed on release. (725 ILCS 185/1). The Circuit Court of

8

Cook County, Illinois has de-emphasized pretrial services and little or no pretrial service investigation is done prior to bond hearings in Central Bond Court in the First Municipal District, which essentially comprises the City of Chicago. Pursuant to the law and practice in other counties, there should be an interview of each detainee prior to his bond hearing by a pretrial service officer. The information collected should include employment or school attendance, residential stability, substance abuse history, any failures to appear at court, the current charges, prior arrests, and the number and type of any prior convictions. This collected information is then to be presented in open court for both the defense and prosecution to argue their positions on the setting of bail. Based on the information and arguments presented, a judge may then make a fully informed bond decision for an individual detainee. Among the conditions of bail bond authorized by Illinois State Statute is the provision that a defendant may be placed under supervision of a pretrial service agency, probation department, or court services department in a home supervision capacity with the use of an improved electronic monitoring device. (725 ILCS 5/110-10).

Judicial placement is a necessary component of the Electronic Monitoring Program due to the fact that the courts, not the Sheriff, have more information, the benefit of arguments of counsel, and an opportunity to observe the detainee in order to make an informed decision on an individual's eligibility.

During an internal review of the Electronic Monitoring Program in 2006, it became readily apparent that certain selection criteria needed to be upgraded.

Additionally, the "Trotter Report" (Review of the Cook County Felony Case Process and its Impacts on the Jail Population, American University, Criminal Courts Technical Assistance Project, a Program of the Bureau of Justice Assistance, U.S. Department of Justice, Sept. 26, 2005) (See attached Exhibit "A") concluded in a comprehensive study undertaken by a panel of experts and paid for by the County that the absence of pretrial release decision-making by the Court impeded pretrial release and increased crowding at the County Jail.  The Trotter Report concluded at Page 46:

> "...Pretrial services, properly designed and operated to provide both information for the release and bond decision as well as monitoring and supervision of released defendants, <u>will reduce the jail population for the following reasons</u>:  (Emphasis provided).
>
> First, judges making release decisions will possess good information on which release decisions and conditions of release may be based....
>
> Third, in contrast, the AMF Program operated by the DOC does not rely on a consistent set of risk assessment criteria to determine whether to release a defendant on AMF.  Consequently the releases are sporadic and related mostly to jail capacity rather than the suitability of a defendant to be released and the conditions that would make the release appropriate..."

At the present time, the Cook County Department of Corrections has approximately 900 individuals assigned to EM on a daily basis.  This is the largest Electronic Monitoring Program for pretrial detainees in the United States.  It is almost twice the number of the next largest program which would be in Broward County, Florida, with 470 pretrial detainees on EM.  Our research has found no other program in the country that places pretrial inmates on electronic monitoring without an order by a court of competent jurisdiction.

10

The Sheriff recognizes that the Electronic Monitoring Program can be a valuable tool in reducing the population at the Cook County Jail. However, eligibility must be based on informed decisions made in the context of a court hearing where relevant facts about the pretrial detainee that would support either release or confinement could be fully aired.

The JHA '07 Report at Page 60 comments on Sheriff Dart's position that responsibility for releasing inmates to reduce or eliminate crowding should be transferred to the Circuit Court of Cook County. The Sheriff's reduced assignment of individuals to electronic monitoring is a considered and reasonable response to the conclusion that the Sheriff's Office does not have adequate information in all cases to make informed decisions as to whether an individual is a good risk for release on EM. The Sheriff wishes to note, however, that with the implementation of judicial placement in which release decisions are made by judges after input from pretrial services, prosecutors, defense counsel and/or the probation department, the Sheriff believes that the number of persons on electronic monitoring could once again be substantially increased thereby alleviating overcrowding in the jail.

**DEPARTMENT OF WOMEN'S JUSTICE SERVICES ("DWJS")**

The DWJS administers three highly successful programs which utilize an integrated model that addresses substance abuse, mental health and physical health issues. Studies conducted by the Northwestern University in association with the

National Institute of Correction s ("NIC") found that characteristics of women offenders in Cook County are as follows:

- 80% are single mothers with three or more children;

- 80% have been charged with non-violent offenses.

- 75-90% of the women are addicted to drugs or alcohol.

- 80% have been physically or sexually abused.

- 80% also suffer from the co-occurrence of addiction, mental health disorders and trauma.

DWJS has devised and implemented the Sheriff's Female Furlough Program ("SFFP"), a female day reporting program. The participants report to the program at the jail daily for treatment and case management services and return to their homes each evening to care for their families. In the evenings the majority of the participants are electronically monitored while remaining in their homes. The program provides assistance to the participants in many areas including substance abuse, mental health and physical health treatment, literacy, parenting, and life skills. At the present time the SFFP is designed to accommodate 135 participants in its daily population.

The JHA '07 Report indicates that the average daily case load for the SFFP is 133.5 participants a day. However, it should be noted that the facilities for the SFFP are designed to accommodate only 135 participants in its daily population. Nevertheless, as of June 1, 2007, the program is averaging approximately 150 women each day which is sorely stretching present resources and personnel.

In 2005 and 2006 the Sheriff reported on a plan to significantly expand the SFFP program by building a facility on a portion of the property which is already occupied by the Cook County Boot Camp. The building was to be a simple one story building which could be constructed at low cost due to the fact that it would simply serve as a Day Reporting Center where program instruction could be carried out. This facility was not designed to provide residential or custodial care for the participants so it would not have to be built according to correctional institution specifications. The construction of the facility was delayed in 2005 and 2006 due to required soil testing pursuant to the Federal and State Environmental Protection Acts. The Sheriff has been informed by the County that issues with soil contamination were discovered during soil testing. As a result, the soil remediation costs and other variables such as increased material and construction costs have resulted in shelving the plans for the facility indefinitely. It should be noted that the construction of the facility would have resulted in moving the entire SFFP Program to that building and would have freed up additional beds in Division VIII which could once again have been used for male inmates.

**WOMEN'S RESIDENTIAL PROGRAM ("WRP")**

Although it is not an alternative release program, the Women's Residential Program provides integrated services dealing with many complex issues that impact women who are pre-trial detainees and inmates. The unit occupies Division VIII and currently has 120 beds which are fully occupied. Substance abuse and mental health treatment services are provided through agencies which are awarded contracts based

13

on meeting requirements set by DWJS for gender and culturally responsive treatment services. There are three phases in the program, including a phase to prevent relapses and a phase to ease transition back into the community.

Due to the increase in the Cook County jail's female population, the Women's Residential Program should be expanded beyond the present 120 bed capacity. In 1996, there were 12,079 women booked into the Cook County jail and in 2004 this number had increased to 16,259. Although the majority of the women booked into the County jail meet the criteria for DWJS programming, the lack of additional funding has hindered the expansion of services necessary to keep up with the increase in the female population.

As pointed on in the JHA '07 Report, the WRP operates at approximately 95% to 98% capacity at all times.

**M.O.M.S. PROGRAM**

The M.O.M.S. Program is now an 8 bed, off-site residential unit for pregnant and post-partum addicted women. The program was cut in half due to a decrease in funds appropriated for the CCDOC by the County Board. A recovery home allowing newborns to stay with their mothers is available to participants. Out-patient services are offered through Project Safe, a special out-patient program for women that provides childcare, intervention, prevention, diagnosis, and treatment for chemically dependent mothers. Health education services are also provided, as well as specialized counseling

services for substance abuse, mental health disorders, and domestic violence. The program also assists participants in lending and providing housing alternatives.

As of June 1, 2007, more than 196 drug-free infants have been born during the program's existence. The savings to the citizens of Cook County are enormous when considering that the average cost for medical services provided by the County during the first year of life to children born addicted due to their mother's chemical dependency exceeds $250,000.00 per child. The program is always operating at a peak level. Unfortunately, there are always more than 8 pregnant pretrial detainees in CCDOC who are eligible for the program.

**EXPANSION OF THE DWJS PROGRAMS**

The DWJS programs are extremely efficient and cost effective. DWJS utilizes an integrated model that addresses substance abuse, mental health, trauma recovery, physical health, and prevention of relapse. It also incorporates supportive services such as GED/literacy, job training/placement, life skills, anger and stress management, parenting, childcare, housing, family reunification and other services. This integrated model has created a safe and supportive treatment environment for women in the criminal justice system. The Directors of the DWJS program have created links with at least 93 community service and non-governmental organizations which currently assist in providing vital programs and services to female detainees. The bonds which have been forged with these organizations over the years by DWJS leaders have been accomplished through their dedication to providing a program designed to break the

intergenerational cycle of trauma, addiction, and crime that is too frequently visited upon women and their children.

As first pointed out in the Sheriff's 2005 Response, DWJS began collaboration with Northwestern University's Feinberg School of Medicine in October of 2004, under a grant from the National Institute of Health - NIDA. Northwestern University and the Chicago Department of Public Health are continuing to study the DWJS model to scientifically validate its programs. NIDA has issued a preliminary finding that as a result of participating in DWJS programming, <u>all</u> women in the study thus far reported a significant reduction in symptoms that affect functioning. Thus, the integrated model developed by DWJS is highly effective.

The United States Department of Justice's National Institute of Corrections ("NIC") has reviewed the integrated model which was developed by DWJS and has named DWJS one of its 12 model programs in the United States. There are approximately 315 women receiving services through DWJS. With the construction of the Women's Justice Services Center within the next 18 months, it is anticipated that DWJS could accommodate at least 100 additional women in the SFFP program. However, even without the addition of the new building, DWJS is understaffed and requires additional positions for staff members and correctional rehabilitation workers ("CRWs") to professionally operate its programs.

DWJS still has only 3 Sergeants, 1 Lieutenant and 1 Superintendent covering all three shifts, days off, in-service training, and vacations. This group of supervisors has

been working extremely long hours and averaging a great deal of overtime. Due to the County Board's appropriation for additional correctional personnel, positions have been budgeted for added supervisors.

## THE DAY REPORTING CENTER ("DRC")

The Day Reporting Center ("DRC") operated by DCSI continues to provide structured treatment services and supervision to male participants who have successfully completed an electronic monitoring or other release program. The DRC attempts to provide an integrated model for participants in the form of supportive life management services. After a one week orientation program following admission, the participants are assigned to one of approximately a dozen program tracts.

Mandatory toxicology screening is performed on all DRC participants one to three times weekly.

DRC provides educational programs for adult basic education as well as GED preparation. Additional classes are provided that deal with anger and stress management, parenting, and substance abuse education and treatment. DCSI staff review the EMP participants on a regular basis to attempt to identify candidates for transition from EMP into the DRC program. The DRC has been operating effectively since March of 1993 and has an active daily case load of approximately 370 participants. The decrease in DRC population is largely due to the decrease in EMP participants from which DRC participants are chosen.

**PRE-RELEASE CENTER ("PRC")**

PRC is a residential treatment program which provides an alternative to pre-trial detention at the Cook County jail. The majority of the PRC participants are selected from the general CCDOC population based upon their willingness to participate in substance abuse treatment provided by the Human Resources Development Institute, Inc. Other participants are transferred to the PRC from the Daily Reporting Center should they display a need for temporary residential treatment. The PRC was originally designed to provide treatment opportunities for substance abusers. More recently, however, the program has also accepted and treated individuals with histories of domestic violence. Over the last 3 to 5 years, some members of the judiciary have begun using the Pre-Release Center as a sentencing option for domestic violence offenders, as the center provides classes and education relating to issues of domestic violence as well as substance abuse. Up until August 2, 2005, the Pre-Release Center had a capacity of 300 beds which had been kept virtually filled on a daily basis since the inception of the PRC program in mid-1994. On August 2, 2005, an additional 150 beds came online as a result of an expansion plan which had been in the works since 2002. By August 15, 2005, all 150 additional beds had been filled with participants.

There is no question that the addition and subsequent occupancy of 150 beds has had a substantial effect in reducing the overflow population of the County Jail. The beds in PRC are always filled to capacity as it has proven to be an effective program.

**COOK COUNTY BOOT CAMP ("CCBC")**

The CCBC program permits participation in the program for up to a maximum of one year. Each participant's program commences with an 18 week residential incarceration phase followed by a 10 week period of community supervision (i.e., after care). Subsequent to the custodial phase, a participant is released on electronic monitoring. During the community service phase of the program, participants may be assigned to the Day Reporting Center or may be permitted to work or attend school. The CCBC has a capacity of 240 available beds for participants in the incarceration phase of the program. The program has operated at or near at capacity since its inception in 1997.

As of February 6, 2007, 5,398 individuals have completed the first phase of the Boot Camp Program. Approximately 420 individuals participate in the post-release phase of the program on a daily basis. Random drug testing is done on all participants. Substance abuse counseling is provided if needed. The CCBC program provides individuals with academic programs, job training and placement, in addition to methods for improving self-discipline. The distinguishing feature between the CCBC and other Boot Camp programs is the emphasis on education in addition to job training and on site placement services.

As of February 6, 2007, 924 participants have received their GEDs while participating in the Boot Camp. The GED exam will be offered on site to CCBC participants 12 times during this fiscal year. Approximately 250 individuals will take

the GED test this year. Reading and math levels have risen 2.0 and 1.5 grades respectively with each platoon since the start of the program. Computer training and basic industrial math courses are also available to participants.

The Boot Camp is now working with the West Side Technical Institute of the City Colleges of Chicago to increase educational opportunities for Boot Camp graduates. Refresher classes are offered two hours a week for educational and vocational programs at West Side Tech. Additionally, students are given the ACT test which may qualify them for entrance into the city colleges.

In the area of employment it should be noted that more than 1,650 individuals have found meaningful employment following the successful completion of the incarceration phase of the program. Personnel from the Construction Industry Service Corporation (CISCO) now review with each graduating platoon all the opportunities available in the construction industry. Each trade's apprenticeship program is explained and instruction is provided for applying for these programs. Interested individuals are contacted when submitted applications are accepted by the trade of their choice.

The state legislation which created boot camps permits inmates who are facing anywhere from one to seven years in the Illinois Department of Corrections ("IDOC") to participate in Boot Camp under certain circumstances in lieu of serving IDOC time. The average sentence for an inmate is three to five years. The John Howard Association estimates that the cost to the State of Illinois for housing an individual in the Illinois

Department of Corrections for one year is $25,000.00. Using that figure, the savings to the State of Illinois created by the CCBC is in the hundreds of millions of dollars since its inception.

The Office of Sheriff of Cook County again welcomes the accolades that it has received from the John Howard Association which has recognized this program as a great success in terms of community improvement, corrections excellence and conservation of scarce public funds.

**B.     JAIL CAPACITY; FACILITIES STATUS AND PLANNING ISSUES; HIGH PRIORITY ISSUES**

In our response to the Court last year, the Sheriff identified three 2007 high priority budget requests. The Sheriff noted that the projects were of the utmost importance for the continued operation and management of the County Jail. The projects which were proposed had also been identified as significantly important by the MGT of America Staffing Study (An Assessment of Correctional Staffing at the Cook County Department of Corrections submitted by MGT of America, Inc., 2005) and the John Howard Association.

The Sheriff had long maintained that the Reception, Classification and Diagnostic Center ("RCDC") located in the basement of Division V of the County Jail and originally designed as a storage area for inmates' clothing is obsolete and inadequate for the tasks of processing new arrivals, transporting detainees to and from court appearances, and the release of all detainees. In early 2006, the plan for the construction

of new receiving, intake and screening facilities was proposed jointly to the County along with Cermak Hospital executive representatives.

As of this date, the Sheriff is pleased to report that the County Board has approved funding for the construction of a new Reception, Classification and Diagnostic Center along with funding necessary for the replacement of the Residential Treatment Unit which houses detainees with certain chronic medical problems. Several meetings have been held with the project managers appointed by the County to determine the exact design and specifications for the facilities. It is hoped that the project will be completed by late 2009.

Last year the Sheriff also identified as a high priority item a new Jail Management System to replace the present CIMIS System which dates back to the 1980's and is extremely obsolete. Once again, the County Board has committed to funding the revamping of the Jail Management System and will allow for network based enhancement to the data processing system. The planned project would include several components integrated into one system. A summary of the primary segments of this system are as follows:

- Bar coding devices to track the movement of inmates in and out of the system using the present i.d. card format.

- Tier desk mounted computers to provide the reporting, log book and attendance, reference and critical information processing that is presently limited by the manual transcription of information. (There are presently over one hundred different log books kept on a daily basis for the different functions and divisions of the jail).

22

- Jail management software that will automate all facets of the Department of Corrections consistent with the components of the present CIMIS and will eliminate the present manual record keeping systems that are presently in use.

- Automated Fingerprint Identification System ("AFIS") biometric expansion of the present arrest booking system that will allow for positive identification and recording of all movement of persons in and out of the jail complex and its various divisions.

- Information sharing software and hardware that will allow simultaneous transmission of data with other units of government requiring the sharing of this data and the processing of individuals and records.

A third high priority request by the Sheriff for the 2007 budget was for the installation of video camera and recording systems at the County Jail. Over the years, the Department of Corrections and the Sheriff had completed several projects in various portions of the County Jail involving the installation of video cameras and recording systems. Experience showed that the locations that had video recorded camera systems had a much higher level of safety, security, and created an environment that allowed the retrieval of recorded images when required.

The County Board has approved the Sheriff's request at this time and the project for the installation for video and recording systems are in the planning stages. The program will provide video recording equipment for the interior and exterior of the CCDOC facility.

23

A final important project and budget request by the Department of Corrections was for the implementation of plans to improve visitation. The County Board has agreed to fund a test project for an improved gate visitation center for one tier in Division XI. It is hoped that after an evaluation of that project, additional funds will be provided to improve visitation.

As the JHA '07 Report points out, ongoing renovation projects conducted in several divisions of the jail have affected one or more living units in the divisions and have resulted in a shortage of available beds in certain divisions. However, continual repairs and maintenance are necessary due to the age of the facility and the constant use and abuse by detainees. All repairs and maintenance is performed by Cook County facility maintenance and the Sheriff is dependent upon them to make repairs when necessary in a timely manner.

## II.    CONDITIONS AND COMPLIANCE WITH THE CONSENT DECREE

## A.    ENVIRONMENTAL HEALTH

As pointed out in the JHA '07 Report, sanitation in all of the living units has been successful. Although significant progress has been made over the years regarding chronic maintenance problems in the CCDOC facilities, mechanical maintenance has remained a problem. The Sheriff wishes to note that mechanical maintenance is not done by the CCDOC, but is provided by the Cook County Department of Facilities Management ("CCDFM").

CCDOC staff members consistently continue to submit work orders to Facilities Management.

With regard to the RCDC in Division V, we had previously noted that the County Board has committed to providing funding for an entirely new Receiving, Diagnostic and Classification Center and Residential Treatment Unit. The eventual replacement of the RCDC will be one of the most important projects undertaken at the CCDOC in several years.

## B.   PERSONAL HYGIENE

As the JHA '07 Report points out, the CCDOC has done a good job of supplying inmates with clean clothing, linen and mattresses, in addition to personal hygiene items such as soap, toothpaste, toothbrushes and toilet paper throughout the year. The problem of chronic shortages of rubber soled canvas shoes issued to the inmates was occasioned due to the severe budget crisis which was widely reported upon. The problem with the shortage has been solved since the passage of the 2007 budget and inmate supplies, canvas shoes, and other personal hygiene items have been provided to all detainees in adequate amounts.

## C.   FOOD SERVICE

Food service is provided by Aramark, Inc., pursuant to a contract with Cook County. The CCDOC employs a registered dietician who regularly inspects conditions in the central kitchen, monitors menu plans and tests meals that have been prepared. As noted in the JHA Report, the CCDOC dietician monitors contract specifications, and

requires meals to be returned to the central kitchen if she concludes that they were improperly prepared or failed to make contract specifications.

The CCDOC registered dietician also oversees food preparation for inmates with special dietary needs due to medical conditions. The CCDOC registered dietician coordinates with the Cermak Health Service ("CHS") providers to insure that inmates with prescribed dietary restrictions receive special medically approved meals.

CCDOC administrators have worked hard during the last year to improve food delivery to the various divisions throughout the facility. As pointed out in the JHA Report, most of the problems with food delivery have been resolved. Part of the solution resulted from the acquisition of 150 new food carts and 20,000 new food trays. The new food carts are better insulated and keep food warm as well as being more durable so that they remain in service. The 20,000 new food trays are made of a solid plastic composite and are also more durable and easier and quicker to sanitize.

## D.    STAFFING

The JHA '07 Report accurately sets forth specific data relating to staffing at the CCDOC. The budget provided for 189 additional correctional officers, 15 correctional sergeants, 33 correctional lieutenants, one correctional captain, one Systems Analyst II, one Programmer III, six Administrative Assistant I/Records Clerks, and four Administrative Assistant II/Law Librarians. The Sheriff's Office has filled 105 positions for correctional officer, 12 correctional sergeant positions, five correctional lieutenant positions, the one correctional captain position, and all of the records clerk and law

26

librarian positions. Additional cadet classes are scheduled to fill the 84 remaining correctional officer positions by February 1, 2008. CCDOC administrators are involved in the process of evaluating candidates for promotion to the remaining three correctional sergeant positions and 28 correctional lieutenant positions. Until the 2007 Budget, CCDOC had received no budget authority for supervisory positions for over ten years.

The JHA '07 Report raises two issues which the Sheriff agrees may again create substantial staffing problems for the CCDOC. The budget cuts to Cermak Health Services require correctional officers to more frequently transport detainees to the Fantus Clinic/Stroger Hospital for health services. It will be several months before the Sheriff can completely assess the impact on the staffing of the CCDOC due to the budget cutbacks at Cermak Health Services. However, it can be said that the effect will not be a good one. Furthermore, the Cook County Jail has just received accreditation from the American Correctional Association. One of the bases for the accreditation was the availability of on-site medical services provided by the Cook County Department of Health under the auspices of Cermak Health Services. The dramatic cutback in health services may result in a loss of CCDOC's accreditation by the American Correctional Association.

Another potential staffing problem will result from the possibility that the system of video bond hearings will be discontinued. If that is the case, detainees will once again have to be physically brought to bond courts for hearings which will require

a large number of correctional officers be assigned to that process. The Sheriff believes that discontinuing the video bond court would be a significant step backward and has recommended that the videotaped process be continued. It should be noted that videotaped bond hearings are routinely done in most major jurisdictions in both state court and federal court systems.

Due to the increased staff levels resulting from the budget appropriations over the last three years, the practice of cross-watching, which is prohibited in certain divisions by the Consent Decree, has been all but eliminated.

## E.     OVERCROWDING

Although there is still some overcrowding in the CCDOC, it was eliminated for several periods of time during the last year. Furthermore, practices such as the reclassification of inmates and the transfer of maximum security inmates from Division XI to Division I has insured that there is no overcrowding in maximum security divisions.

As set forth earlier, an improved selection process requiring judicial placement of pretrial detainees on electronic monitoring will go a long way toward eliminating overcrowding in the medium security divisions. The necessary cooperation from the judiciary can and will almost completely eliminate instances of overcrowding at the Cook County Jail.

F.    **ACCESS TO LAW LIBRARIES**

As reported earlier in the area involving staffing, the CCDOC received four additional budget positions for law librarians. Those librarians have been hired and are on staff. We believe the addition of four librarians will permit expanded access to the libraries, increase assistance to inmates seeking to conduct legal research, and will help expand the days and hours of law library service. Due to the past shortage of librarians, access to the libraries was sometimes restricted because some library staff members were not available for work due to vacation or sick days. Although that problem was minimized by assigning law librarians from other divisions to insure that each library was opened for at least some period of time during the day, the additional staff should help to eliminate the problem in the future. The computerized legal research which has been available in each library for some time has been provided with regular updates of court reports and other legal documentation over the last year. The CCDOC purchases computer-based legal material from both Lexis-Nexis and Thompson West in an attempt to provide inmates with the most recent case law.

G.    **OTHER PROGRAMS AND SERVICES**

As pointed out in our last response, 15 additional correctional rehabilitation workers ("CRWs") were funded by the Fiscal Year 2006 Budget. All 15 positions have been filled and their training has been completed. The 15 new CRWs are working full time in Program Services. The CRWs are responsible for, among other things, assisting

detainees with family issues, financial issues and initiating and monitoring grievance procedures.

## H.   VISITING

The JHA '07 Report contains no criticisms of the visiting program at the County Jail.  As noted earlier, a program to test a new visiting arrangement has been scheduled for Division XI.  We will report on the outcome in our next response.

## I.   HEALTH ISSUES AND SERVICES

The Sheriff agrees with the assessment of health services set forth in the John Howard Report.  The Sheriff is deeply concerned about cutbacks which have been imposed on Cermak Health Services.

Many hours are spent by CCDOC staff escorting detainees and inmates to and from hospital/clinic visits and securing inmates in hospitals without prison wards due to cutbacks at Cermak Health Services.  The Sheriff recommends that locked prison wards be set aside in County hospital facilities so that correctional officers do not have to be assigned to three shifts 7 days a week to secure one detainee at an unsecured hospital facility.

With respect to the Residential Treatment Unit, plans are underway for a completely new building.  In the meantime, there is insufficient space in the present RU building to house every inmate with chronic medical conditions.  In every division of the jail there is at least one living unit which is designated for inmates who have special medical or psychiatric needs and who have been discharged from Cermak Health

30

Services or the RU by health providers. Due to the increasing number of inmates who have chronic medical problems, the CCDOC administrators have taken action to place inmates who cannot be housed in the RU building in the most suitable living units available in other divisions.

## J.     GRIEVANCE PROCEDURES

During 2006, approximately 60% of all grievances submitted by inmates involved medical care. At this time, the Sheriff cannot conclusively assess whether the significant increase in medical grievances are directly related to the reductions in health services, but that is where the evidence points.

As the JHA '07 Report points out, the total number of grievances has increased substantially, possibly due to 15 additional correctional rehabilitation workers assigned to the CCDOC who are responsible for initiating and monitoring the grievance procedure. The Sheriff believes that this is the basis for the increase in grievances alleging verbal and physical abuse by security staff. The increase in the number of grievances involving verbal and physical abuse by staff corresponds numerically to the increase in the total number of grievances which were submitted.

The CCDOC administrators welcome the opportunity to meet with the JHA staff to discuss the manner in which these grievances are investigated and resolved. It is extremely important to note that the John Howard staff heard very few complaints about verbal and physical abuse by CCDOC staff even though they made several visits to every division during the course of the last year.

31

## K.    DISCIPLINARY PROCEDURES

Ten percent (10%) fewer disciplinary incidents were filed in 2006 than in 2005. Furthermore, the dismissal rate of cases for failure to conduct timely hearings is approximately 1.1%   Very few inmates have complained with regard to untimely disciplinary hearings within the last year.

Additionally, no disciplinary cases were dismissed due to incomplete incident reports for the entire year.   This is due to the practice instituted by CCDOC administrators requiring that supervisory personnel and superintendents review all disciplinary incident reports before initiating disciplinary procedures.  The Disciplinary Hearing Board continues to document that some of the incidents involving inmate psychiatric problems were non-disciplinary.   The Disciplinary Hearing Board recognizes that some actions by certain inmates are attributable to their mental status and discipline should not be meted out as a result of those actions.

## L.    INMATE AND STAFF INJURIES

The CCDOC takes seriously its obligation to insure both the safety and security of the correctional staff and any inmate who is remanded to its custody.  There has been an increase in the rate of injuries to both inmates and staff during 2006.  From January of 2002 through March of 2005, a period of 39 months, there was a downward trend in the rate of both staff and inmate injuries.  The CCDOC in an attempt to stop the increase in inmate and staff injuries has put in place a practice which permits only one-half (1/2) of the population of each living unit out of their cells at a time and into the Day Room

area for free time. The time out allowed by the groups is staggered so that one group would be out in the morning hours on one day and in the afternoon the next day. The CCDOC administrators believe that this practice is part of the reason why disciplinary incident reports have decreased by more than 10% during the last year. The CCDOC administrators are further convinced that the practice will result in a significant decrease in the number of inmate and staff injuries in the next several months.

It should be noted that the JHA '07 Report urges the CCDOC administrators to do something to attempt to reduce the incidents of inmate and staff injuries, yet at Page 118 of the report criticizes the program designed by CCDOC to decrease the injuries. The restriction of time out of cells is justified if it is designed to reduce disciplinary incidents and injuries to inmates and staff. The amounts of time which inmates are allowed out of their cells are well within acceptable correctional standards and are effective. As noted in the JHA '07 Report at Page 119, "the significant reduction in the number of incidents reported at the CCDOC is …. commendable …"

CCDOC administrators are willing to meet with JHA staff to discuss the time out of cell practice in an effort to assure the court monitor that the program is justifiable, effective and within correctional standards. As always, the CCDOC administrators are willing to listen to suggestions and recommendations from the JHA staff and take actions which may resolve any differences of opinion.

33

## M.     PROTECTIVE CUSTODY

The Protective Custody Program at the Cook County Jail is a voluntary one which is available to any detainee who requests it.  The detainees who request a transfer to the Protective Custody Unit are aware that participants in the program are kept in their cells for approximately 23 hours a day.  Furthermore, protective custody detainees can request a transfer at any time out of protective custody for return to the general population.  The purpose of the Protective Custody Unit is to provide the utmost protection and to keep inmates who may have a reason or desire to hurt another inmate from being able to do so.  The procedure has been extremely successful and individuals in the Protective Custody Unit have not experienced the increase in injuries which have occurred in other divisions of the jail.

Time and again, the CCDOC has emphasized that detainees housed in protective custody are kept in their cells for approximately 23 hours a day due to the fact that some inmates have been found to request transfer to protective custody so that they could actually have contact with, and possibly harm other protective custody detainees.

The suggestion that inmates requesting PC be evaluated individually to determine whether there are any other inmates in their Protective Custody Living Units from whom they must be kept separated will not provide accurate information about inmates who may wish to harm another.

When an inmate voices a fear for his or her personal safety, the claim is taken seriously and protective custody is provided. The procedures employed by the CCODC are constitutional and in compliance with the Duran Consent Decree.

## CONCLUSION

Sheriff Thomas J. Dart recognizes that the constitutional office to which he has been elected brings with it the obligation to use the powers of the office to provide for the safety and security of the citizens of Cook County, the staff of the CCDOC and any individual who is remanded to his custody. Sheriff Dart is committed to fulfilling his obligations to the citizens, the staff, and the detainees. Sheriff Dart assures this Court that it is his intention to maintain a secure and professionally operated correctional facility with a highly qualified, well-trained and dedicated staff, which will provide constitutional conditions of confinement.

Respectfully submitted,

Thomas J. Dart,
Sheriff of Cook County

BY:  s/Daniel F. Gallagher
Daniel F. Gallagher
Querrey & Harrow, Ltd.
175 West Jackson Blvd., Suite 1600
Chicago, IL 60604-2827
(312) 540-7000
I.D. #905305

Document #: 1235310